15953

WALKER v. ATLANTA & CHARLOTTE AIR LINE RY. CO.
*ET AL.*

(43 S. E. (2d) 206)

444

*Messrs. Frank G. Tompkins,* of Columbia, and *P. A. Bonham,* of Greenville, for Appellants, cite:

*Messrs. Wyche, Burgess & Wofford* and *Hingson & Todd,* all of Greenville, for Respondent, cite:

Messrs. *Frank G. Tompkins,* of Columbia, and *P. A. Bonham,* of Greenville, for Appellants, in reply.

May 30, 1947.

TAYLOR, Justice.

This is an appeal from Greenville County and the case involved an alleged injury to plaintiff who was at the time walking across a trestle on the railroad of the defendant company. The injury came about when a string of cars, detached from the locomotive, overtook and ran over plaintiff. The plaintiff alleged willfulness, wantonness, recklessness and negligence on the part of defendant, its agent and servant; and the defendant, answering, admitted the plaintiff was struck and injured by one of its trains while attempting to cross the trestle maintained by the defendant, but denied that the injury was caused in the manner and circumstances alleged; and on the contrary, set up that his said injury was due to plaintiff's own willfulness, wantonness, recklessness and negligence, combining and concurring with the said willfulness, wantonness, recklessness and negligence of the defendant, without which the injury would not have occurred. The case was tried at the June, 1946 term, and the jury's verdict was $5,000.00 actual damages.

In due course defendant moved for a non-suit, directed verdict and for judgment for the defendants *non obstante veredicto,* all of which were denied.

Notice of intention to appeal was duly given, and thereafter this appeal was perfected listing five exceptions, which, however, defendant states in its brief, raise only two questions; *viz.,* whether the Court should have granted defendant's motion for non-suit and directed verdict (1) since the evidence failed to show any actual negligence on part of defendant, (2) since the evidence was susceptible of no other reasonable inference than that plaintiff was himself

guilty of contributory negligence which operated as a proximate cause of his injury.

The facts gleaned from the record are as follows:

The trestle upon which the accident occurred was in the freight yards of the defendant railroad. It appeared that this trestle which had alongside of it a walkway, the adequacy of which was questioned, was admittedly used by the public as a convenient means of passage. The episode involved in this action occurred at night and shortly prior thereto, the train crew of the train which later ran over plaintiff, observed him as he passed along the track where the crew had congregated in a moment's idleness about the locomotive. Plaintiff proceeded along the track some little distance and until he was upon the trestle involved. At that time the train of freight cars, which had been detached from the locomotive for the purpose of effecting some switching operation, and, according to the trainmen, was lighted by flares or fuses, in addition to which the trainmen who were stationed on the front and carried electric torches, overtook plaintiff from the rear and ran over him. These freight cars had no audible mechanical signal such as bell or whistle, for use in warning persons on or about the track, but the defendant depended upon the flares and torches and vocal warnings to give notice of the approach of the cars.' As the cars approached plaintiff, he was observed by the trainmen on the track about 50 yards ahead, and, as they expressed it, they "hollered" a warning at the plaintiff, who thereupon looked back, and to quote the trainmen again, began a "zig-zag" attempt to escape, and in so doing, fell across the tracks and the cars ran over him, with the resulting injury. The trainmen testified that the cars, as they rounded a curve in the tracks near by, emitted a noise occasioned by the friction of the wheels against the track and the drawheads working against each other. No attempt to apply brakes was made and none of the trainmen were stationed at the hand brakes. Plaintiff testified the

first information he had of the approach of the cars was some one calling "look out."

There was some testimony that plaintiff had the odor of alcohol on his breath after the accident and a partially consumed pint bottle of whiskey was found near his person at the scene. He testified that he had consumed two glasses of beer and that he had drunk no whiskey. The plaintiff testified that he was not under the influence of intoxicants.

Construing this testimony most strongly against the defendant, as is the rule where motions for a nonsuit and directed verdict are concerned, it is the opinion of this Court that same was sufficient to warrant submission of the case to the jury and that the motions were properly refused. The exceptions are accordingly overruled and the action of the lower Court affirmed.

Judgment affirmed.

FISHBURNE, STUKES and OXNER, JJ., concur.

BAKER, CJ., dissents.

STUKES, J. (concurring).

Careful consideration of the evidence adduced at the trial of this case has convinced me that the court did not err in refusing to direct a verdict for the appellants or set that aside which was found by the jury. I think more facts should be stated than are contained in the opinion of Mr. Justice Taylor and in the dissenting opinion of the Chief Justice.

The testimony of the trainmen themselves, from which the following statements are taken and inferences drawn, necessitated in my opinion submission to the jury of the issue of liability for actual and punitive damages and the photographs introduced in evidence by appellants are of assistance. This was the conclusion of the trial judge who had the advantage of observation of the

witnesses on the stand. The trestle was in a track in a portion of appellants' yard but it was almost immediately adjacent to a street of the City of Greenville which was necessary to be crossed to get to a freight station, and the attached boardwalk was used generally by the public as a convenient walkway. There were a tool house and trees (in summer foliage) when the accident occurred which obstructed the view and the trestle was filled by the time of the trial and it no longer exists. The narrow boardwalk was a part of the trestle and on the left-hand side of the track as respondent attempted to cross, and on the high side of the trestle.

The so-called cut of cars, consisting of 20 boxcars of the average length of about 40 feet, was moving of its own momentum, without locomotive attached, without any mechanical signaling device, with brakes of dubious efficiency (handbrakes which were in fact not used in any attempt to prevent the accident) and with makeshift lights at the front end—a fusee stuck in the drawhead of the lead car, another in the hands of a trainman on top of this car, but not at the forward end of it, and electric lanterns carried by the two trainmen atop the car. (Respondent testified that he saw nothing of the lights, even when he turned toward the approaching cars upon hearing the vocal warning.) The employees admitted in evidence that these lights (feeble, compared with the ordinary headlight of a train) were not even intended to illuminate the way ahead, and in lieu of signals they contended that the noise of the rolling cars, particularly as they rounded the nearby curve, sufficed. A switchman's testimony thereabout is quoted:

"Q. And that was the only way that train had to signal anybody to get out of the way, was the flanges on the rail? A. No, sir, there were two men up there.

"Q. But no whistle? A. No, sir, but they had a mouth."

A locomotive stood on an adjoining spur, with crew aboard, waiting to enter the track behind the cars and push

them when the force of gravity gave out, but its bell was not rung or its whistle sounded in warning to respondent or any other member of the public about to use, or using, the accustomed walkway along the trestle to the street. These usual signals were apparently not even given for the street crossing; instead, one of the crew dismounted and went ahead to "flag" the crossing with a fusee. Like precaution, if taken at the intervening trestle, would doubtless have prevented injury to respondent.

The trainmen were congregated at rest when respondent passed along on his way to cross the trestle and no train or engine was in motion thereabout; he saw their idle engine and they saw him and one commented to the others upon his fine size and well-fitting uniform and observed that he would make a good plowhand. In a very few minutes they released the handbrakes of the cars (which, significantly, had held them at the hilltop, uncoupled to a locomotive) and permitted them to roll down the decline in the direction that they had just seen respondent walk along the track.

The curve in the track made vision of either by the other first impossible and, of course, the lack of a headlight or effective substitute on this dark night continued to obscure the view of the train crew which was also obstructed by the tool house and trees which have been mentioned. Their testimony was that they first saw respondent about 50 yards ahead of the front end of the lead car when he was about halfway the trestle and they.shouted and orally whistled a warning to him, but did nothing else. At that point the downgrade had ended and a rise had begun so that the loose, unbraked cars were moving upgrade at a speed of only from five to eight miles, possibly 10, per hour and it is inferable that they may have been stopped in time by prompt application of the handbrakes. The two crewmen who saw respondent in his peril testified that after the shouted warning he stopped and turned, apparently first seeing his danger, and then ran toward the end of the trestle,

away from the cars, between the rails, in a zigzag manner. However, in so limited a width he could not have "zigged" or "zagged" to much extent. Then they saw him fall and still did nothing until they felt the wheels of their car run over him when one of them, quoting his testimony, "ran back to the second car and started after a brake and it was too late and I ran to the head car and got down and flagged the crossing". The same witness testified that he ran back to the second car in search of brakes because he could not remember whether he had a brake on the lead car but his further evidence indicates that he knew that the brake on that car was "tied". The cars ran two car-lengths after the crewmen saw respondent fall, then ran over him and, after that, for three more car-lengths, and finally stopped, still without benefit of brakes. On further cross examination the witness said that the cars would have been stopped at the speed they were traveling in four car-lengths had the available brakes been applied quickly, which would have been probably within 10 feet from the place of the accident, and, inferably, would have resulted in additional vital time for respondent to have gotten up from his fall and escaped.

Another of the trainmen testified that it was necessary almost nightly to tell some member of the public to get off the track at this point, that people used it as a walkway every night. Moreover this witness, who was also atop the lead car, said that he and the other crewman there first saw respondent when the cars were almost 50 yards from the trestle and respondent about halfway across. These figures, accepting the testimony that had the handbrakes been used the cars could have been stopped in about four car-lengths, indicate that injury would have been prevented by prompt and competent use of the brakes whether respondent was able to recover from his fall or not.

It seems to me that the testimony of the trainmen convicts them of utter disregard for the safety of respondent and of failure to exercise the slightest care to avoid the injury which they saw, or should have seen, was imminent.

Furthermore, the jury may have reasonably concluded that the shifting practice of appellants amounted to recklessness, wantonness and willfullness in releasing 20 boxcars at the crest of a grade without accessible and efficient braking, without a headlight, without signals and with no warning ahead, over a thoroughfare which was in constant use by the public and adjacent to a street in a thickly populated section of a city. The locomotive's idle signaling devices should have been put to use.

The practice of "kicking" cars in shifting operations over a village street was condemned by this Court in *Bain v. Northwestern Railroad Co.*, 120 S. C. 370, 113 S. E. 277, opinion by Mr. Justice Cothran. There is no practical difference between "kicking" cars and turning them loose at the top of an incline for in both cases they are "wild", nor between, so far as pedestrians are concerned, a small town street and a publicly and generally used path, and this case is the more flagrant because of the existence of the time of the accident of the open trestle of considerable length, high on the walkway side, less so on the other. The practice is known as "making a flying switch". By their strong language in *Johnson v. Seaboard Air Line Ry. Co.*, 163 N. C. 431, 79 S. E. 690, 696, Ann. Cas. 1915-B, 598, the North Carolina court left no doubt of their disapproval. From it I quote:

"* * * This court has recently declared, in *Vaden v. North Carolina Railroad Co.*, 150 N. C. 700, 64 S. E. 762, that: ' "Making flying switches" on the railway tracks and sidings running across and along the streets of populous towns is *per se* gross negligence, and has been so declared by all courts in this country and by text-writers generally. It is stated in one of the best known textbooks that the use of a running switch in a highway in the midst of a populous town or village is, of itself, "an act of gross and criminal negligence on the part of the company" '— citing Sherman & Redf. Neg. (3rd Ed.) § 466; *Wilson v. Atlantic Coast Line Railroad Co.*, 142 N. C. 333, 55 S. E.

257; *Allen v. Atlantic Coast Line Railroad Co.*, 145 N. C. 214, 58 S. E. 1081; * * * *Farris v. Southern Railway Co.*, 151 N. C. 483, 66 S. E. 457, 40 L. R. A., N. S. 1115; *Kentucky Central Railway Co. Railroad v. Smith*, 93 Ky. 449, 20 S. W. 392, 18 L. R. A. 63, 66, to which is appended a most valuable note upon this subject. In this respect, the *Vaden Case* and this one cannot possibly be distinguished. So we see that defendant was 'grossly' in fault at the very inception of this lamentable occurrence. It started wrong in the beginning and continued wrong throughout. It had set a death trap for the passer-by, and the plaintiff unwarily, but without fault, was caught in it, and came very near losing his young life. Will the railroads never stop doing, in this respect, what the courts have so emphatically condemned as contrary to law and humanity? If plaintiff had been killed, upon the facts found by this jury, the person to blame for his death would have been guilty of manslaughter for his palpable negligence with full knowledge of its dangerous tendency."

The wisdom of the rule is seen in the facts of this case. The yard switchman, who was atop the middle of the lead car, said that if the engine had been coupled to the cars they, rolling upgrade, could have been stopped almost immediately.

The cited case of *Pryor v. Atlanta-Charlotte Airline Ry. Co.*, 179 S. C. 423, 184 S. E. 137, is a stronger precedent, I think, for respondent than for appellants, certainly with respect to actual damages, which the jury awarded in this case. There the running down of the pedestrian was by a locomotive of a fast train in broad daylight while here the accident occurred late at night, in addition to the many other differences in the facts of the cases. There is no contention in this appeal as there that respondent was a trespasser. *Pryor's case* was remanded for trial of the issue of negligence. *Smalley v. Southern Railway Co.*, 57 S. C. 243, 35 S. E. 489, turned upon the conceded fact that the plaintiff's intestate was a trespasser and is therefore inapplicable here.

*Pinson v. Southern Railway,* 85 S. C. 355, 67 S. E. 464, is closer in facts but decedent was walking the track facing the train, meeting it, and the crew of the attached locomotive sounded the whistle repeatedly and rang the bell before starting the train. The facts of the case impel the inference that the erratic conduct of the deceased which contributed to the accident resulted from intoxication. In *Robinson v. Atlantic C. L. R. Co.,* 179 S. C. 493, 184 S. E. 96, deliberate attempt was made by bicyclists to hurry over a grade crossing ahead of a known approaching train. I do not consider it a presently applicable authority. A case of considerable similarity to this is *Jones v. Charleston & W. C. Ry. Co.,* 61 S. C. 556, 39 S. E. 758, which involved the death of a pedestrian on a walkway along a railroad track in the city of Anderson. I consider the case in hand stronger for the plaintiff for reasons apparent upon comparison of the facts of the cases. Our leading case upon the subject is, perhaps, *Sanders v. Southern Ry.,* 90 S. C. 331, 73 S. E. 356, which involved a Charleston accident; the last relating to injury to a pedestrian-licensee appears to be *Hayes v. Atlantic C. L. R. Co.,* 196 S. C. 386, 13 S. E. (2d) 921.

Appellants pitch their argument anent contributory negligence upon the premise that the verdict of the jury for actual damages alone has absolved appellants of the charge of recklessness, willfulness and wantonness—is equivalent to an express factual finding that they were innocent of such—so that it is now established that they were guilty only of simple negligence; and to liability therefor any negligence of respondent, which contributed proximately to his injury, was a defense to liability. But whatever may be said for the position, it is not available to appellants for they made no point of it in the lower court although they moved for judgment *non obstante veredicto* on other grounds. The authority of *Gleaton v. Southern Ry. Co.,* 208 S. C. 507, 38 S. E. (2d) 710, is conclusive. There in pressing appeal from order refusing motion for judgment *non obstante veredicto* the appellant argued that

the verdict against the railroad company alone was inconsistent with liability, for the codefendant engineer was thereby acquitted of the alleged acts of negligence (for which he was responsible). The appeal failed as here it must because the point had not been made in the trial court and there was no adverse ruling from which to appeal.

Moreover, if appellants' premise be sound and the verdict established that they were guilty of only simple negligence and if the point were available to them, I should be unable to say upon the evidence, as does the Chief Justice, that respondent was contributorily negligent. On the contrary, I think with the trial judge that it was a factual issue for determination by verdict. Respondent's effort to run forward from the train of cars when he suddenly discovered them bearing down upon him from behind in the darkness may have been as much as the jury expected of a reasonably prudent man in the circumstances (some of appellants' witnesses gave as their opinion that it was the natural thing to do) and his tripping on the trestle a pure mishap—an "unavoidable" accident. It is said that he was negligent, as a matter of law, in going upon the trestle without looking back but it appears from the evidence that such action would have been futile (and therefore the omission did not proximately contribute to the injury) for by appellants' witnesses it was shown that, because of the curve and obstructions, he was not in the line of vision of the train crew on the lookout until they were about 50 yards from him or the trestle and he halfway across it. By the same token he could not see the cars and lights, even looking backward (and he also had to look ahead and at the same time watch his footsteps), until he was halfway across. Looking for the approach of these loose cars before he entered upon the trestle would, therefore, have been in vain. In view of all of the evidence, which will not be recounted further, I am unable to conclude that respondent was contributorily negligent as a matter of law, especially in the light of the rule which requires that in determining the

sufficiency of the evidence to support the verdict, the testimony and all reasonable inferences must be taken most strongly against the movant. *Covington v. Atlantic C. L. R. Co.,* 158 S. C. 194, 155 S. E. 438, certiorari denied *Atlantic Coast Line R. Co. v. Covington,* 282 U. S. 858, 51 S. Ct. 33, 75 L. Ed. 759.

I therefore concur with Mr. Justice Taylor in affirmance of the judgment of the Circuit Court.

FISHBURNE and OXNER, J.J., concur.

BAKER, Chief Justice (dissenting).

I regret that I do not find myself in accord with the opinion of Mr. Justice Taylor, and must dissent because it appears to me that the only reasonable inference to be drawn from all of the testimony is that the respondent was, as a matter of law, negligent in particulars contributing directly and proximately to his injury.

Respondent was in the armed services of the United States at the time of his injuries, and was stationed at the air base at Greenville. He was a graduate of a high school in this State for negroes, and of a negro college in Virginia. He had been stationed at Greenville for about a year, and had become familiar with the locus of the accident, by reason of having a brother living on nearby Wardlaw Street in the City of Greenville, whom he visited frequently.

The accident occurred on a trestle, which was part of the railroad tracks in the yards of the appellants. The trestle was estimated to be 60 to 70 feet in length. As one approached the trestle, proceeding in the direction of Wardlaw Street, on the lefthand side, was a board walk about two feet in width. Between the walkway and the cross ties was a beam about eight inches in width. Boxcars extend over the rails to the end of the cross ties, or to the beam, and ample space was afforded for persons to stand or walk on this walkway in safety as a cut of cars passed over the trestle. No witness testified to the contrary, although one

of the respondent's witnesses said he would "hate to be caught * * * there at night". On the side of the trestle where the walkway was placed, it was six to eight feet to the ground, and on the other side it was only a foot or two above the ground.

About 11 o'clock on the night of the accident, the respondent was going from the negro U. S. O. center in Greenville to his brother's house. Admittedly he had used the trestle as a short cut to and from the City, having walked over it in daytime and nighttime 30 to 40 times. He knew this was part of the appellants' yard and that trains shifted there. He entered upon the trestle of appellants without taking the slightest precaution for his own safety, not even looking back to see if a train or cut of cars was coming. While he says he was using the board walkway adjacent to and parallel with the track (trestle), yet when he was first observed by the trainmen on the cut of cars hereinafter mentioned, the respondent was not on the board walk, but was in the middle of the trestle, between the rails; and the weight of the testimony and all the circumstances surrounding his injury, and the position and place in which he was lying immediately after the cars passed over him, point conclusively to the fact that he was not using the walkway, but was traveling in the middle of the track or trestle. A cut of cars was moving along these tracks in a switching operation, which, according to custom, was effected by releasing the brakes and permitting the cars to roll of their own momentum. The conductor and a switchman of the train crew were riding the head car, and there was a fusee stuck in the draw head of the lead car. In addition to this the said trainmen had lanterns in their hands, and one of them had a burning fusee. The cut of cars which ran over and injured respondent could have been seen by one traveling in the direction of the trestle if he had merely taken the precaution to look in the direction from which the train was coming, and the cars were making considerable noise, especially in rounding a curve near the trestle. Of course, it

is a matter of common knowledge that the fusee on the draw head of the lead car was not intended to, nor did it cast a ray which would permit one riding on the car to see an object on the tracks except for a short distance, but is discernible to one facing same, for a long distance.

Assuming that respondent was in a normal state of mind, and had the capacity to exercise reasonable care for his own safety, which the appellants certainly had the right to assume, he knew, or should have known, that the board walk was a safe place for a person to stand or walk as a train passed over the trestle, and that he could get off the trestle on one side by merely stepping to the ground, and on the other by jumping without any great risk of injury. As the cut of cars approached, the trainmen, seeing him in the middle of the track, hollered out to give him warning of their approach, and the respondent, instead of getting on the walkway or stepping or jumping from the trestle to safety, started to run in a zigzag manner, and was overtaken and run over by the cars, resulting in his injury.

The cut of cars was traveling at about five to seven miles per hour, which was not much faster than a person could walk. It is clear that if the respondent, before entering upon the trestle, had observed any care for his own safety, by using the walkway in its entirety, or by stopping, looking or listening, he would undoubtedly have seen and heard the approach of the cut of cars, and that, although he failed to see and hear the cut of cars approaching, had he exercised reasonable care, after he was made aware of the approach of same, he could have stepped to safety on the walkway or jumped to safety from the trestle. He is not in a position to claim relief from the exercise of ordinary care, on account of sudden peril or emergency, for he was the author of the emergency, if one existed, since admittedly he went on the trestle without looking or listening for an approaching train or cut of cars. While the facts are not analogous, we think that this conclusion is supported by the previous decisions of this Court. *Pinson v. Southern Railway,*

85 S. C. 355, 67 S. E. 464; *Smalley v. Southern Railway Co.*, 57 S. C. 243, 35 S. E. 489; *Robison v. Atlantic C. L. R. Co.*, 179 S. C. 493, 184 S. E. 96.

If it be conceded that there was evidence of negligence on the part of the appellants still the only reasonable inference that can be drawn from the testimony is that the respondent was also guilty of negligence which contributed as a proximate cause to his injury, and that therefore appellants' motion for a direction of verdict on this ground should have been granted.