7520

PINSON v. SOUTHERN RY.

1. CARRIER—PASSENGER—LICENSE—NEGLIGENCE.—A passenger leaving a train before its arrival at the station while walking along the track where people are accustomed to walk is only a licensee. Here there being no proof that carrier's agents knew the deceased was drinking to such an extent that he was unable to take care of himself, or that he had gotten off the train, that he was run over on the carrier's track by a backing freight train, conclusively shows no negligence on the part of carrier.

2. IBID.—IBID.—That an employee of the carrier not connected with the passenger train saw the deceased apparently drunk walking on the tracks, but did not know he had gotten off the train, does not make it the duty of the servant to look after the deceased.

3. RAILROADS—AIR BRAKES.—There is no rule of law requiring freight trains to be equipped with automatic air brakes, but if there were it is not shown here that the failure to so equip this train was the proximate cause of the death of plaintiff's intestate.

4. AN ADMINISTRATOR cannot maintain an action for the wilful and negligent mutilation of the body of his intestate.

Before MEMMINGER, J., Cherokee, February Term, 1909. Affirmed.

Action by J. M. Pinson against Southern Railway Co.— Carolina Division. From judgment for defendant, plaintiff appeals.

*Mr. N. W. Hardin,* for appellant, cites: *Deceased was a passenger when killed:* Pat. Acc. L., section 221; 2 Ency., 745. *Duty of carrier to drunken passenger:* 52 S. C., 19,

330; 4 Ency., 79; 70 L. R. A., 291; 168 U. S., 339; 151 U. S., 209; 149 U. S., 43. *Liability for exposure of remains:* 61 S. E., 278; 75 S. C., 140. *Issue of negligence should have been sent to jury:* 79 S. C., 69; 78 S. C., 63; 68 S. C., 410; 81 S. C., 317; 53 S. C., 203; 56 S. C., 429. *Deceased not guilty of contributory negligence:* 13 Pet., 181; 131 U. S., 22; 75 S. C., 177; 82 S. C., 80; 83 S. C., 325.

*Messrs. Sanders & DePass,* contra: *There was no evidence of negligence or wilfulness on part of carrier:* 61 S. C., 561; 68 S. C., 483.

March 29, 1910. The opinion of the Court was delivered by

MR. JUSTICE HYDRICK. The testimony for plaintiff was that, on December 25, 1905, his intestate, Clarence Pinson, boarded defendant's train at Shelby, N. C., and paid his fare to Blacksburg, S. C. He had been drinking, but was not drunk, and seemed to know his business pretty well. He got aboard without assistance, took a seat in the car, and, when the conductor came through collecting fares, paid his own fare and that of a fellow-passenger. He was not disorderly, but sat quietly in his seat, and behaved himself so that the fact that he had been drinking was not obvious, though, by looking at him, and talking with him, one who was acquainted with him could see that he had been drinking. The conductor had no conversation with him.

When the train arrived at Blacksburg, about 8 o'clock p. m., it stopped about a quarter of a mile from the station to switch from the main line of the defendant's road to the main line of the Southern Railway Company, and run into the station of the latter company, which was operating defendant's road, under lease. The roads cross each other nearly at right angles. When the train stopped, Pinson got off, and started down the main line of defendant's road,

along a path used by the people of the town with the knowledge and acquiescence of defendant.

One of defendant's employees, who was not one of the train crew, had gone to meet the train, and was standing near the switch. After the train passed into the switch, he saw Pinson coming towards him "blundering and stumbling" along the track. He called to him several times and asked who he was, but Pinson did not answer. It does not appear that any of the train crew saw Pinson get off, or knew anything of it.

At the time he got off, there was a freight train, with a passenger coach attached, standing on the main line of defendant's road east of the switch, and headed east. When the passenger train took the switch, this freight train started backward to get west of the switch, so that, when the passenger train had gone into the station and discharged and received its passengers, it would come back on defendant's main line, and proceed east.

Between the points where Pinson got off and where the freight train was standing, there is a very sharp curve in defendant's main line, around the foot of a hill, which shuts off the view of the track for any considerable distance. It was on this curve that the backing freight train struck and killed Pinson.

On the back end of the passenger coach, which was attached at the end of the freight train, were two red light markers, one on each side, a red light lantern sitting in the middle of the platform, and a flagman with a white light lantern in his hand, keeping a lookout as the train ran backwards. Before starting the train backward, the fireman rang the bell and the engineer blew the whistle three times.

As the train was running backward, at the rate of from six to ten miles an hour, the flagman discovered Pinson, about thirty feet from him, coming along in the middle of the track, meeting the backing train. He had his hands in his pockets, and wore a broad brimmed hat, which was pulled

down over his face, and he seemed to be looking down. As he appeared not to see or hear the train, or to be making any effort to get off the track, the flagman called to him, "Lookout;" but Pinson paid no attention. He called again, several times, "Lookout, Lookout;" but, seeing that Pinson did not heed his warning, he attempted to signal the engineer with his lantern, to stop the train, but, on account of the curve and the obstruction of the hill, the engineer could not see the signals. He then ran into the car to put on the automatic air-brakes; but, before he got inside the door, the train struck Pinson. He ran on through the passenger coach to the freight car next to it, but found that there was between that car and the engine a dummy car, that is, one which is not equipped with air brakes. Failing to put on the brakes, he jumped off the train and ran out to where his signals could be seen, and stopped the train, but not until it had passed over Pinson's body, which was badly mutilated.

The accident occurred in the defendant's yards, where trains were constantly passing, and switching was constantly done.

If the train had been fully equipped with air brakes, it could have been stopped within thirty or forty feet.

Pinson's body was left on the track until the next day about ten o'clock. The night was dark, cold and rainy. If Pinson had been looking, he could have seen the approaching train some distance before the flagman saw him, and in ample time to get off the track; or, if he had heeded the calls of the flagman, he could have gotten off in time to save himself.

The complaint alleges that Pinson's death was caused by the negligent, wilful and wanton acts and omissions of defendant: 1. In allowing Pinson to get off the train at a point where passengers are not accustomed to alight, knowing that he was incapable of taking care of himself, and knowing the dangers that beset him, in going from that point along the tracks to the station. 2. In backing the train

around said curve, where the hill obstructed the view and prevented the hearing of the approaching train, with a dummy coach on the rear end, without lights or brakes and without ringing the bell or blowing the whistle, and without giving any warning of the approach of the train.  3. In leaving the body on the track for twelve hours, uncovered and exposed to the inclement weather.

The answer denied the allegations of negligence, wilfulness and wantonness, and pleaded the contributory negligence of plaintiff's intestate.

At the close of plaintiff's testimony, the presiding Judge, on motion of defendant, granted a nonsuit, on the ground (1) that there was no evidence of negligence on the part of the defendant, and (2) because the evidence showed that Pinson was guilty of contributory negligence.

The testimony must be considered in the light most favorable to plaintiff; for if there is *any* testimony from which a reasonable inference in support of plaintiff's cause of action can be drawn, the issue must be submitted to the jury.

No matter what may be the law as to the degree of care and attention which a carrier should give to a drunken passenger, it has no application, unless it appears that the agents and servants of the carrier knew, or, by the exercise of proper diligence, should have known of the condition of the passenger.

In this case, there is no testimony tending to show that any of the train crew knew, or had any reason to suspect, that Pinson was so drunk that he was incapable of taking care of himself, or that he had gotten off the train where he did.  The fact that an employee of defendant happened to be present, and saw Pinson going down the track, apparently in a drunken condition, after the train had passed into the switch, cannot avail the plaintiff. This employee was not on duty and was not a member of the train crew.   It does not appear, therefore, that it was within

the scope of his duties to look after Pinson. Besides, it does not appear that he knew that Pinson had gotten off that train, because he did not see him until after the train had passed. Moreover, at that time, Pinson had voluntarily severed the relation of passenger, and was only a licensee, and defendant owed him no higher or other duty than any other licensee on its tracks, and that was to exercise reasonable and ordinary care to prevent injury to him.

There is no testimony tending to support any of the specifications of negligence contained in the second ground above set out. The only specification in that ground sustained by the testimony is that there was a dummy car in the train—in other words, that the train was not fully equipped with automatic air brakes.

We know of no law which requires that freight trains shall be so equipped. Besides, it cannot reasonably be inferred from the testimony, that, if the train had been so equipped, it could have been stopped in time to save the life of Pinson. The testimony is that, if it had been so equipped it could not have been stopped in less than thirty or forty feet. Pinson was only thirty feet away from it, when he was discovered by the flagman. Now, it would have been a most unnatural thing for the flagman, as soon as he discovered Pinson on the track, to attempt to stop the train by applying the air brakes. He did just what common sense and reason would dictate—called to the man to warn him of his danger, supposing, as he had a right to do, that he was in the possession of his faculties, and could hear and would heed the warning. And the testimony shows, that, after he had done the very things for which he would have been justly blamed if he had not done first, he thought of and attempted to apply the air brakes, but, before he could get inside the door of the car, Pinson was struck. It appears, therefore, even if it could be said that there was any negligence in this respect, it was not the proximate cause of the injury.

As to the third ground: At common law, the plaintiff would have had no cause of action for the death of his intestate. The cause of action is given by what is known as Lord Campbell's act, found, with subsequent amendments, in sections 2851 and 2852, Vol. 1, Code 1902, in which recovery is limited to the "injury resulting from the death," which would not include injury resulting from negligent or wanton exposure of the dead body. In *Griffith* v. *R. R.*, 23 S. C., 25, it was held that "an administrator has no property in the cadaver of his intestate, and, therefore, cannot maintain an action for its wilful and negligent mutilation."

The views herein announced make it unnecessary to consider the second ground upon which the nonsuit was granted.

Judgment affirmed.