## Neuberg, Appellant, *v.* Bobowicz.

Argued January 4, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Norman Shigon,* for appellant.

*Victor L. Drexel,* with him *Pepper, Hamilton & Scheetz,* for appellee.

OPINION BY MR. JUSTICE EAGEN, June 30, 1960:

In a trespass action brought by her husband for injuries and pecuniary losses allegedly sustained by him, as an occupant of an automobile, because of the alleged negligence of the defendants (operators of two vehicles which figured in the intersection collision), Mrs. Neuberg has joined as plaintiff and seeks recovery for the resultant loss to her of his "society, services and sexual companionship." Preliminary objections filed on behalf of one of the defendants, in the nature of a demurrer and a motion to strike from the complaint the paragraph setting forth the prayer of the wife, were sustained by the court below. This appeal is from that ruling.

Thus is there raised directly, for the first time in an appellate court of this Commonwealth, a question much litigated in other jurisdictions of this Union and of England. Does a married woman have a cause of action in Pennsylvania for the loss of her husband's consortium caused by the negligent act of a third party? The authorities elsewhere are many and conflicting. Reasons assigned for the respective positions taken are similarly numerous and divergent.

While, concededly, there are no intra-jurisdictional cases directly in point, there are, in our reporters, cases which shed varying degrees of light on this Court's past attitude toward similar attempts to assert related

causes of action. Undoubtedly contained in the concept of consortium is the element of services. This Court in *Kelley v. Mayberry Township*, 154 Pa. 440, 26 Atl. 595 (1893), when defining "services", referred to Cooley on Torts as follows: "Speaking of the origin, etc., of the term 'services,' the same learned author says the word as now understood in connection with claims by husbands for damages, etc., 'implies whatever of aid, assistance, comfort and society the wife would be expected to render to, or bestow upon, her husband, under the circumstances and in the condition in which they may be placed, whatever those may be.' " In *Quinn v. Pittsburgh*, 243 Pa. 521, 90 Atl. 353 (1914), the charge of the trial court in an action in trespass by a mother, suing for personal injuries sustained by her ten year old daughter and for her own loss of the child's services, was to the effect that the jury could award to the mother damages for "the companionship which she (the daughter) would (otherwise have given) her mother." There would appear to be no distinction between the words "companionship" and "society". In reversing the judgment in favor of the mother, this Court, at page 525, made the following significant comment: "The right to recover for loss of companionship is confined to cases where a husband sues for injuries to his wife. The law does not recognize loss of companionship as an element of damage in any other relation." In *Donoghue v. Consolidated Traction Co.*, 201 Pa. 181, 50 Atl. 952 (1902), we said at 183: "There is no natural right in one person to damages for injury to another. At common law the husband had an action for damages for injury to the wife whereby he lost her services, because he had the right to her services, including her earnings. The right arose from the common law relation of unity of person, the husband as to personal property and services being the

person. But marriage is a civil contract involving rights under the control of the lawmaking power. The legislature may sever the unity of person, and as to property, the right to separate earnings of the wife, and the damages for personal injury to her, it has already done so to a very great extent. It would be but a step farther in the same direction to take away altogether the husband's action for loss of services of the wife."

Before passing on to our review of out-of-state authority, we note that the same question presented here has been ruled on by our lower courts in *Stedman v. Phillips*, 36 Lack. Jur. 128 (1935); *Dupe v. Hunsberger*, 58 Pa. D. & C. 483, 62 Montg. 315 (1946); *Faust v. Kunselman*, 30 Wash. 106 (1948); *Chomko v. Butchabitz*, 53 (No. 2) Lack. Jur. 180 (1952); *Hayes v. Swenson*, 106 Pitts. 141 (1958); and *Mlynek v. Yarnall*, 19 Pa. D. & C. 2d 333 (1959), in only one of which cases, *Hayes*, was this issue decided favorably to the wife-plaintiff. The *Hayes* decision was caused to turn on the theory that "[w]hat is sauce for the gander is sauce for the goose." Even without a painstaking research into the "Game Laws" of this state, we will venture to say that, accepting the analogy, there can be no quarrel with that conclusion as a general proposition. But it is only after an historical inquiry is made into the ancient origins of the gander's sauce, as it were, and as it is applied to the situation at hand, that one can conclude, as we do, that either 1) the sauce was never a proper ingredient of the diet or 2) however indispensable it may have been in decades past, it has no place in that diet today. Be that as it may, it is in our opinion, today more than ever, just that: sauce.

We are advised that the trend of the hour is toward the complete and universal emancipation of women and

that this end is, to a large extent, now an accomplished fact. Of that we have been aware. The roots which at one time, if ever, gave nurture and a legitimate birth to the husband's right to assert a claim for loss of consortium have long since wizened and died. They owe their origin to a seed of thought which, when viewed by the eyeglass of the present day, none should accept, much less implant anew. In St. Matthew's Gospel, Chapter XIX, we find the precept that "a man shall leave [his] father and mother, and shall cleave to his wife and they twain shall be one flesh." The lawyers at early common law seem to have developed this into the legal principle that "by marriage the husband and wife are one person and the husband is that one." Sir William Blackstone declared that "Upon this principle of a union of person in husband and wife depend almost all the legal rights, duties and disabilities that either of them acquire by the marriage" and that "the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband under whose wing, protection and cover she performs everything": Book I, Chap. 15, Blackstone's Commentaries, 1 Lewis 411. In effect, the woman spouse was her husband's chattel, his property. She owed him duties much the same as did a servant his master. If he by injury to her suffered a loss of some feudal service owing to him by her, he and he alone—for she was too inferior a subject to have any such right, much less the privilege to assert it—was allowed to sue to recover, just as he would sue for injuries done to his cattle. He, for all technical purposes, owned her at common law and, consistent with that now universally rejected theory, he was accorded the right to recover for "loss of consortium". That the woman today is not regarded as she was at common law is too obvious for comment.

The husband's right to recover on this theory is without present day justification. The historical fictions have been shattered. The pillars which for decades had been regarded as lending support to this monument to the lord are today so effectively undermined by remedial legislation which recognizes the status of the wife as equal to that of her spouse that, in an increasing number of jurisdictions, they are being razed rather than looked to for further and extended service. As stated in *Kaczorowski v. Kalkosinski*, 321 Pa. 438, 444, 184 Atl. 663 (1936), in speaking of the long established legal prohibition of tort actions between spouses, "When the policy behind a rule no longer exists, the rule should disappear." In this connection we note the following language of the Court of Appeals of New York in *Kronenbitter v. Washburn Wire Co.*, 4 N.Y. 2d 524, 151 N.E. 2d 898, 176 N.Y.S. 2d 354, 355 (1958): "To decide otherwise would be contrary to principle . . . The argument that equality of the sexes calls for a change overlooks that the husband's right to damages for loss of consortium is based on outworn theory." Then, quoting from 18 Law & Contemp. Prob. 219, 229, the court adopting the language of Professor Jaffe continued: " 'More persuasive is the argument that since the husband has an action, so should the wife. But his action is a fossil from an earlier era. It is one of a group of archaic actions based on the notion that the paterfamilias was alone competent to sue for losses suffered by the family unit . . . When to the husband's action there is now added the wife's action for negligent injuries (which being emancipated she is entitled to bring) there is a danger of duplicating elements of damage. Ingenious efforts must be made to disentangle from the wife's recovery the constitutents of the husband's cause of action. Indeed, *the emancipation argues for the restriction or abolition of these*

*actions rather than their extension.* Some courts have been bold enough entirely to abolish the husband's action . . . ,'" citing a list of cases to which can now be added *West v. City of San Diego,* 346 P. 2d 479 (1959) and *Alsop v. Eastern Air Lines, Inc.,* 171 F. Supp. 180 (E.D. Va. 1959), the latter of which construes a Virginia statute which disposes of the problem in a rational and commendable manner.

Nor has the doctrine as applied to the husband's right to sue for loss of consortium been free from increasing areas of "sore spots" in our own jurisdiction. It is feared that absurd results, already promised by the following cases, would but spread epidemically were we to create in the wife a right which we have already seen she never had at common law. In the very recent case of *Anderson and Wheeler v. Rogers,* 21 Pa. D. & C. 2d 13 (1959), we see this anomalous situation. A married woman was injured on April 21, 1956. She sued on March 5, 1957. She was divorced very shortly thereafter. She was remarried in June of 1957. On April 11, 1958, a motion was made to amend the complaint so as to plead a cause of action in favor of her former husband who the attorneys and court believed was still married to her. This was allowed after her divorce and remarriage. Later, on August 4, 1959, a petition was made to amend the amended complaint so as to substitute the name "Barnes" (the name of her second husband) wherever the name "Wheeler" had appeared, thus seeking to afford the second husband recovery for *his* loss of consortium. This was denied on the sole ground that the Statute of Limitations had barred his claim. The following interesting discussion appears in that opinion: "The case at bar presents the possibility of a unique circumstance. Had Pearline Wheeler informed counsel of the change in her marital status at the time when it occurred or prior to the

expiration of the Statute of Limitations, both the former and present husbands might have appeared in this case as parties-plaintiff with separate causes of action for medical expenses and loss of consortium suffered by each while married to the plaintiff-wife and resulting from her alleged injuries caused by the alleged negligence of the defendants. There does not appear to be any reason preventing such an inclusion of parties plaintiff if each of their actions were to be filed timely." This case relied on *Orga v. Pittsburgh Railways Company,* 155 Pa. Superior Ct. 82, 38 Atl. 391 (1944). There a woman was injured five weeks before her marriage to plaintiff. The lower court had charged the jury that the husband was entitled to damages, present negligence, for loss of consortium and the jury so found. No objection to this charge was made at the trial and the issue was held improperly raised for the first time on appeal to the Superior Court. But that court, referring to the husband's right to recover under those circumstances had timely objection been made, said at 85: "As to compensation for the loss of his wife's services, there is very respectable authority in other jurisdictions to support a verdict for that, too." This bit of dictum in *Orga* was specifically rejected by a court of inferior jurisdiction in *Donough v. Vile,* 61 Pa. D. & C. 460 (1947).

We hesitate the longer to reincarnate the right to sue for loss of consortium in the form for which contention is made here when we see this confusion raised, seemingly, to the third power by the following even more involved, complexities. A determination of what is meant by "consortium" is itself a problem, as evidenced by the fact that, as late as 1951, in the English case of *Best v. Samuel Fox & Co., Ld.,* [1951] 2 K.B. 639, 657 Lord Justice BIRKETT, after reviewing the decision of the United States Court of Appeals in *Hitaffer*

*v. Argonne Co., Inc.,* 183 F. 2d 811 (D.C. Cir. 1950), (the first and leading American case recognizing the right asserted in the instant case), was compelled correctly to state: "The term 'consortium' is nowhere defined with complete precision."

There is great conflict also with respect to its application. Some courts hold there can be no recovery for an alleged loss of consortium unless there is a loss of services; that a mere loss of society is not sufficient. *Russell v. Marboro Books,* 183 N.Y.S. 2d 8, 18 Misc. 2d 166 (1959); *Best v. Samuel Fox & Co., Ld.,* supra. Some rule that there can be no recovery for a mere *impairment* of the other spouse's capacities but that recovery is only for the *loss,* temporary or permanent of the elements of consortium. In Pennsylvania, however, the fact " 'That services in the ordinary sense were not rendered at all would be immaterial and irrelevant, except as the fact might, under some circumstances, tend to show a want of conjugal regard and affection and thereby mitigate the damages.' " *Kelley v. Mayberry Township,* supra; *Platz v. McKean Twp.,* 178 Pa. 601, 36 Atl. 136 (1897); *Delaware, etc., R. Co. v. Jones,* 128 Pa. 308, 18 Atl. 330 (1889). Thus, the fact of marriage to the injured spouse is itself apparently enough to support a finding for recovery, because "in such cases jurors, endowed with at least a modicum of common sense, may be supposed to have some knowledge of ordinary affairs of life." *Kelley v. Mayberry Township,* supra, at 448.

Even, then, among the authorities which have always recognized the right as applied to the husband, there are irreconcilable differences as to the very definition of the cause of action itself, its application in practice, and its interpretation generally. It is, at best, a vague, undefinable and embarrassing left-over from another day and age.

We have reviewed the cases cited to us by appellant from the jurisdictions allowing recovery under circumstances similar to the situation here. Our research has uncovered still other cases favorable to appellant: *Hoekstra v. Helgeland,* 98 N.W. 2d 669, S.D. (1959); *Montgomery v. Stephan,* 359 Mich. 33, 101 N.W. 2d 227 (1960). It is enough, without more, to say that we are unpersuaded by those opinions, each of which is an exhaustive treatise on the subject. Rather do we feel, as did Lord PORTER in *Best v. Samuel Fox & Co., Ld.* [1952], A.C. 716, 728 when he said: "Even if it be conceded that the rights of husband and wife (in this respect) ought to be equalized, I agree with the Lord Chief Justice that today a husband's right of action for loss of his wife's consortium is an anomaly and see no good reason for extending it." We cannot assent to the argument that since the status of a married woman is now, in all other respects, so improved as to render her equal with her husband, that this, in itself, establishes her right to a cause of action for loss of consortium. Rather do we share President Judge HENNINGER'S thoughts as expressed in *Mlynek v. Yarnall,* supra, in the following language: "If, as contended, the husband's right to recover for loss of consortium is based upon the wife's lowly status as a servant or as a chattel, then to grant the wife a right to so recover does not lift the wife to the status of her husband, but it reduces the husband to the outworn concept of the wife's lowly status. Rather than grant to the wife the right to damages for loss of consortium, the logical solution would be to terminate the husband's claim on the theory that the wife is no longer the servant and chattel."

Appellee argues that if we should grant the right to the wife there would follow attempts by others in an intimate relationship to assert similar causes of

action. In short, it is contended that if a wife can recover for injuries to her husband, then others—children, dependent members of households, possibly even business partners—should perhaps also be allowed to sue to recover for the inconveniences to which they were put by the injury. Indicative of the efforts made by others to recover on this theory are the following cases: *Hill v. Sibley Memorial Hospital,* 108 F. Supp. 739 (D.C. 1952); *Halberg v. Young,* 41 Hawaii 634 (1957); *Meredith v. Scruggs,* 244 F. 2d 604 (9th Cir. 1957); *Gibson v. Johnston,* 166 Ohio St. 288, 144 N.E. 2d 310 (1956); *Erhardt v. Havens, Inc.,* 330 P. 2d 1010 (1958); *Turner v. Atlantic Coast Line Railroad Company,* 159 F. Supp. 590 (N.D. Ga. 1958); *Jeune v. Del E. Webb Construction Company,* 77 Ariz. 226, 269 P. 2d 723 (1954); *Eschenbach v. Benjamin,* 195 Minn. 378, 263 N.W. 154 (1935); *Sisk v. Pressley,* 81 F. Supp. 16 (E.D. S.C. 1948); *Pinson v. Southern Ry.,* 85 S.C. 355, 67 S.E. 464 (1910); and, *Pleasant v. Washington Sand & Gravel Company,* 262 F. 2d 471 (D.C. Cir. 1958). Recovery was allowed in none of the above cases. It would appear, however, that, with few exceptions, the arguments used on behalf of a married person in a consortium suit against the negligent third party could be urged with no less validity in actions against responsible tortfeasors brought by or on behalf of infant children of an injured party.

The fact that recovery is allowed in trespass to a wife against a defendant for criminal conversation or alienation of affections presents a situation which is not analogous to the matter here at issue and has not deterred courts from denying relief in cases of the type now before us. In *Karchner v. Mumie,* 398 Pa. 13, 156 A. 2d 537 (1959), this Court recognized for the first time the right of a wife to recover damages for criminal conversation. That right is preserved to the wife in

many jurisdictions which disallow recovery by her as against a negligent defendant for loss of consortium. Said COHEN, L.J., in *Best*, supra, ". . . in the enticement cases intentional infringement of the rights of the consort is an essential ingredient in the cause of action. The remedy in that case may therefore be treated as a natural extension of the principle. . . . Moreover, no injustice can be done to the defendant since, ex hypothesi, his action was malicious. . . In cases such as the one before us, however, it is impossible to suggest any malice against the wife on the part of the defendant or any intentional interference with her right of consortium. . . It seems to me, therefore, that it would be an extension of a line of decisions in itself anomalous if we were, in such cases as the present, to recognize a right of action in a wife corresponding to that which the courts have recognized as vested in the husband. . . . True it is . . . that this involves the recognition of a distinction between the respective rights of a husband and of wife which is contrary to current opinion; but it has never been held that the wife has any right of servitium from the husband, and an extension of the principle to actions by the wife seems to me to involve real hardship on a defendant who will have already paid damages to the husband, in assessing which, allowance will, I think, have been made for the impairment of his ability to perform his obligation to support his wife." The opinion of another Justice sitting in the same case reads, in part, as follows: ". . . if the husband's own right had first come in question as res integra today, it would probably have been negatived. As it is, the husband's right being deeply entrenched in authority and the wife's never having been affirmed, I think that the intervention of the legislature would be needed to produce equality either by abolishing the husband's cause of action or by retaining it and

conferring a similar cause of action on the wife. I do not believe that at present the wife has such a cause of action as is claimed. Whether she ought to is, of course, quite another question." Our thinking is in accord with this approach to the question presented. Believing the cause of action for "loss of consortium" to be an anachronism, we are unwilling to extend the rule allowing it to another line of cases. Accordingly, we hold that a married woman has no cause of action in Pennsylvania in trespass for the loss of her husband's consortium caused by the negligent act of a third party.

The order of the court below is affirmed.

Mr. Justice BELL concurs in the result.

———

CONCURRING OPINION BY MR. JUSTICE BOK:

I concur in Mr. Justice Eagen's result and reasoning but wish to add a word because of the difficulty he mentions in determining what is meant by consortium. In the English case cited in his opinion, *Best v. Samuel Fox & Co., Ld.* (1952), A.C. 716, Lord GODDARD said, citing Bracton's De Legibus Angliae, Blackstone's Commentaries, and Holdsworth's History of English Law, "—and there are no books of higher authority—[they] all show that the action which the law gives to the husband for loss of consortium is founded on the proprietary right which from ancient times it was considered the husband had in his wife. It was in fact based on the same ground as gave a master a right to sue for an injury to his servant if the latter was thereby unable to perform his duties. It was an action of trespass for an invasion of the proprietary right which, arising from the status of villeinage or serfdom, a master had in his servant."

I shouldn't care to extend to wives, in their current state of emancipation, any such notions as that about their husbands or give them a right necessarily based on them. Better even than equality in the right of consortium is thus to reveal its true basis in the hope that the unreality of the husband's right may become apparent in the light of the times and result in its abolition.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On December 28, 1958, Israel Neuberg was seriously hurt in an automobile accident, sustaining injuries to and about his head, neck, body, and upper and lower extremities. In addition, the violence of the impact brought about a heart condition and caused a cardiac neurosis. He instituted an action in trespass against the two motorists allegedly responsible for his miseries.

His wife, Toby Neuberg, joined in the complaint and asked for damages in her own behalf. Specifically she explained in Paragraph 8 of the complaint that: "As a result of the aforesaid personal injuries and disabilities of the plaintiff, Israel Neuberg, his wife, Toby Neuberg, has, is, and will in the future, suffer the loss of the society, services, and sexual companionship of her husband, Israel Neuberg."

One of the defendants moved to strike this paragraph from the complaint and the Court of Common Pleas No. 5 of Philadelphia County granted the motion. This Court now affirms that decision and thus destroys the right of a wife to recover for the loss of her husband's companionship, with all that the word companionship signifies. The legal term for material companionship is *consortium* and it is defined in Black's Law Dictionary as: "Conjugal fellowship of husband and wife, and the right of each to the company, co-

operation, affection, and aid of the other in every conjugal relation."

It will be noted at once from this definition that while consortium is the very life blood of the marital state, it is something different from and beyond what the husband means to his wife in providing her with physical support and maintenance.

Certainly when a girl gives up her home and family with all the tender associations which have been hers to enjoy since infancy, she expects, and is entitled to have, from her husband, a comfort, companionship, society and love which in their combined virtues will offer her even greater happiness than that which she cherished in the midst of her brothers, sisters, and parents. This claim to her husband's protection and affectionate mantle becomes hers as much as the wedding ring he places upon her finger. And it is *this* dedicated devotion which makes her a wife, because if marriage were to mean merely the guarantee of a roof, clothes and food, then, by entering into the bonds of holy matrimony, the wife would really be receiving only a key to an exclusive boarding house.

No one can possibly question in enlightened America that the physical and mental companionship of her husband is a right possessed by every married woman. And it is a legal property, not only a moral blessing. It is that kind of property which entitles her to a severance of the marriage contract if he fails to abide by the vows undertaken at the altar rail. This vested prerogative is so firmly established in the married woman that if somebody steals away her husband's affection, society, fellowship and comfort, she may bring an action of alienation of affections against the invader of her personal realm.

If we allow, as we do, a wife to recover against the malefactor who robs from her the love and affection

due her from her husband, why should she not be allowed to recover against the person who destroys the husband's capacity to give her the love, affection, and care which constitute the *res litigiosae* of an alienation of affections suit?

The complaint filed in this case would indicate that the injuries sustained by Israel Neuberg have rendered him incapable to devote to his wife the society and companionship inherent in the marital relationship. It would appear that the disabilities suffered by the husband will deprive the wife of undoubtedly the most precious wealth that a wife could possess, namely, the sacred right to motherhood. Does this kind of deprivation mean nothing to the law?

The flesh and blood of our American civilization is the family. Without children, not only our civilization but the race itself would perish. Does it not mean something to the law to protect this right; and punish for its destruction? Are we to understand from the decision rendered by this Court today that a wife may bring an action against any person who steals her pocket book, steps on her foot, or injures her dog, but she may not bring an action for the loss of her most valued privilege?

Justice SMITH of the Michigan Supreme Court addressed himself to this question in his brilliant opinion in the case of *Montgomery v. Stephan*, 359 Mich. 33, 101 N.W. 2d 227, in the following vivid language: "In such circumstances, when her husband's love is denied her, his strength sapped, and his protection destroyed, in short, when she has been forced by the defendant to exchange a heart for a husk, we are urged to rule that she has suffered no loss compensable at the law. But let some scoundrel dent a dishpan in the family kitchen and the law, in all its majesty, will convene the court, will march with measured tread to the halls of justice,

and will there suffer a jury of her peers to assess the damages. Why are we asked, then, in the case before us, to look the other way? Is this what is meant when it is said that justice is blind?"

The Majority has written a long opinion, but I do not find in its entire length any justification or even attempted rationalization for its conclusion that a wife may not recover for the loss of her possibility to procreate children. The opinion does not even mention the word Motherhood.

To enter into any eulogy on Motherhood would be "to gild the vernal morn", but it may be relevant to say that Motherhood is a privilege and responsibility so sacred and divine that women have been known to accept poverty, contumely, and untold sacrifice to achieve it within the sanctified sphere of matrimony. The pages of the human race are golden with instances of women who have married worthless men, even scamps, so as to produce children who would engladden their lives and enrich the world, hoping that with the advent of the children, the husbands might become better men and be worthy of the accolade of father.

This Court would not refuse to a woman the right to recover damages for the tortious loss of a born child. Why then should she be refused appropriate damages for the tortious loss of the possibility of having a legitimate child by her legitimate husband? A woman who has suffered a physical hurt which makes it impossible for her to bear children may recover because of that grave disablement. May she not recover when that disablement is inflicted on her through her husband?

The Majority Opinion makes no mention of *Potts v. Guthrie*, 282 Pa. 200, in which case we allowed recovery to the wife-plaintiff whose injuries were such

that her child-bearing power was seriously affected, perhaps permanently destroyed. It was as late as 1925 that this Court, speaking through Justice WALLING, said: "That the loss of fecundity is a proper element of damage in a personal injury case is undoubted . . . (citing cases.)"

Is the present Court over-ruling *Potts v. Guthrie,* and, if so, why?

The Majority Opinion quotes from the Gospel of St. Matthew but does not follow it. The opinion reminds the world that: "A man [shall] leave [his] father and mother, and shall cleave to his wife and they twain shall be one flesh."

But if husband and wife are one flesh, then the flesh of the husband is as much that of the wife as of the husband and she should be allowed to enter court to recover for any damage done that flesh.

Mrs. Neuberg's husband has suffered catastrophic damage to his heart. The heart is legendarily the citadel of all the tender emotions of which mankind is capable, but it is more than that: it is the pump which supplies energy, strength, and endurance. That strength has been drastically diminished in Israel Neuberg, and his wife will suffer that diminution with him. If they own property in entireties, she is entitled to share in the usufruct of the property. Is she less entitled to share in the benefits accruing from his love and devotion? And is she to be denied what she loses through her husband's incapacitation?

To say that the decision of the Majority is lacking in chivalry is of no legal significance since chivalry and jurisprudence are not interchangeable, but to say that the decision is unjust is a matter of concern because law is not law unless it is also justice.

Law has but two purposes: one, to prevent a wrong, and the other to correct the wrong which has not been

prevented. Unfortunately, the correction can not always restore to the injured person that which has been unjustly and illegally taken from him. No amount of money can grow a new leg to a body from which the original leg has been severed. However, so much of a worthwhile life depends on the ability to adapt oneself to adversely changed situations, that the law seeks, through the payment of money, to help the aggrieved person to the extent that he may still derive a measure of happiness from his altered state, even though he may have lost what is in its nature irrecoverable or he may have suffered a damage which is irreparable.

Thus, down through the corridors of time, and particularly during the last century or two, the law has so developed that what at one time was regarded incapable of legal evaluation, is now the accepted subject of monetary compensation. For instance, in the early stages of personal injury law, no recovery was allowed for disfigurement because damage had to be predicated only on economic loss. Since a bricklayer, by way of illustration, could lay just as many bricks with a scar illuminating his cheek as one with an unblemished countenance, it was assumed that he suffered no ascertainable loss on account of his disfigurement. Courts, however, now recognize that a disfigured person carries a mental burden of humiliation which seriously affects his enjoyment of life, and the tortfeasor responsible for reducing that enjoyment is legally responsible to make compensation in money.

The defendants in this case, so far as the averments in the pleadings are concerned, have reduced the plaintiff to a physical wreck. The wife plaintiff is a victim of that wreck in that she has physically suffered from its effect as much as if she had been injured herself.

I have said that the decision of this Court in the present case is an unjust one, which in itself is a

rather strong statement to make. But I go further. The decision is more than unjust. It is unsupportable in law, logic, or candid reason. It would be bad enough to deprive Mrs. Neuberg of damages for the loss of consortium, as already discussed, but the Court does not stop there. It now says that even the *husband* may not recover for the loss of the consortium of his wife. It says this in spite of the fact that it has always allowed the husband to enter the courthouse, without knocking, to assert this claim. Why is the door now being closed to him?

The only explanation is that since the Court cannot justify evicting the wife from the mansion of consortium, it will disposses the husband too! Thus, if the Court cannot be just, it at least will be consistent! In other words, it will reduce the conspicuousness of the stain of injustice by spreading it over a larger area. It is like satisfying a child who has been deprived of his bowl of porridge by also taking it away from all his brothers and sisters.

But parity of injustice does not make for equality in rights. The felling of one tree illegally does not justify chopping down the whole forest. Denying the wife of a property which in common sense, fairness and justice is hers cannot warrant striking down the rights in the husband which this Court has never questioned in all the cases which have come before it on the subject.

The Majority simply offers no justification or rationalization for wiping out a vested right which this Court has unstintingly recognized throughout its whole history, and as late as July 2, 1959. In the case of *Spangler v. Helm's New York-Pittsburgh Motor Express*, 396 Pa. 482, this Court affirmed in the name of the husband a verdict of $46,059.54, only a portion of which was ascribable to lost income and value of house-

hold services rendered by the deceased wife. The balance of the verdict was payable under the heading of the loss of consortium. We said in that case: "The only question on this appeal must be stated in terms which might seem materialistic, namely: What did Mrs. Spangler mean to these people [husband and children] in terms of money? Naturally, no husband and no children see in the person dearest to them a money equivalent, and, during life, such an evaluation would be unqualifiedly brutal and offensive. However, with death, problems arise which must be solved, harsh and heartrending as they may be. Thus, as Mr. Spangler and his children now face a future with the main pillar of their family structure missing, the question inescapably follows: How much do they need to supplant that pillar? To begin with, there was very definite physical work performed by Mrs. Spangler, for which no sums were drawn from the family budget. . . But the amount paid to such a housekeeper [who would now be required to do Mrs. Spangler's work] would not compensate for Mrs. Spangler's displacement. There are services performed by a wife-mother which no housekeeper can supply."

A large portion of the verdict of $46,059.54 was affirmed as compensation for what the husband lost in the way of the loving companionship she offered her husband and their children: "The evidence reveals that Mrs. Spangler was unstintingly devoted to her family. The record shows that her loyalty was expressed in an incessant activity, tireless energy, and never-flagging concern. . . All these things—such as companionship, comfort, society, guidance, solace, and protection which go into the vase of family happiness—are the things for which a wrongdoer must pay when he shatters the vase."

It is generally supposed that love, affection, and devotion are abstract terms which have no palpable

reality and therefore cannot be translated into money. In the spiritual world this undoubtedly is true, but where a trespass action for a demonstrated wrongful act is involved, these terms, because of the inexorable law of necessity, must find practical transmutation. The music produced by a symphony orchestra and the fragrances which emanate from a flower garden also fall into the world of the incorporeal, but they are nonetheless very real and can be the subject of material compensation if they cease to exist because of the destruction of the means which bring them into existence.

The mere presence of a mother who cooks and serves a meal adds an enjoyment which is something beyond what one tastes in the food prepared by a hired housekeeper, no matter how conscientious and able that housekeeper may be. The extinguishment of that enjoyment is something which goes into the accounting of the person who extinguished it. The affectionate greeting, the tender solace, the never-failing inspiration are all part of a wife's companionship and a mother's care, which disappear with the intervention of death, and there is no reason why the person responsible for the death should not be required to pay for those lost treasures, as much as he is required to pay the wages of the strange housekeeper, the employed seamstress, the new cook, or the hired tutor.

Who is to compute the financial counterpart of these cherished resources which have been laid in ruins? The answer is, the jury. Who is to appraise the hurt and the haunting emptiness of a home when the mother has permanently departed, even though all the curtains are in place and every piece of furniture is still in use? The answer is again, the jury, who, from the testimony, may visualize the decedent and recreate in their minds what she brought to the household which was dependent upon her.

How can the Majority possibly rationalize affirming a jury's verdict for the loss of consortium in 1959 and then in 1960 refuse to permit the lower courts even to consider consortium? I cannot make myself believe that the Majority's rejection of the principle of consortium is predicated on any assumption that husbands do not love their wives, and wives do not love their husbands as they used to.

What is the why and wherefore of the decision of today? The answer is an enigma, the solution of which cannot be found on any of the many pages of the Majority Opinion nor can it be extracted from the totality of the Majority's argument.

One cannot find relief from this mystery on any hypothesis that this Court erred in 1959 and therefore must make correction in 1960. This Court has been affirming verdicts of the *Spangler* type for a longer time than the life of any of the judges in the Commonwealth. In 1869 this Court approved a verdict for loss of consortium in the case of *Pennsylvania Railroad Co. v. Goodman*, 62 Pa. 329, where the illustrious Justice AGNEW said: "The frugality, industry, usefulness, attention, and tender solicitude of a wife and the mother of children, surely make her services greater than those of an ordinary servant, and therefore worth more. These elements are not to be excluded from the consideration of a jury in making a mere money estimate of value."

In *Kelley v. Mayberry*, 154 Pa. 440, 447, this Court said: "In Cooley on Torts, 226, the general doctrine on the subject is stated thus: 'For an injury to the wife . . . which deprives her of the ability to perform services, or lessens that ability, the husband may maintain an action. . .' Speaking of the origin, etc., of the term 'services,' the same learned author says the word as now understood in connection with claims by husbands

for damages, etc., *'implies whatever of aid, assistance, comfort and society* the wife would be expected to render to, or bestow upon her husband, under the circumstances and in the condition in which they may be placed, whatever those may be."* (Emphasis supplied.)

In *Hewitt v. Pennsylvania R.R. Co.*, 228 Pa. 397, 398, we said: "Recovery by a husband for the loss of the services of his wife, includes not only services in the ordinary sense of the word but *the assistance and comfort* which under the circumstances he would receive from her." (Emphasis supplied.)

The Majority treats all these decisions as if they had been written in the snows of winters which no grandparent can recall.

Under today's decision the husband, in the event of the death or serious injury of his wife, may not recover anything more than the value of his wife's services as a housekeeper, a valet, or kitchen scullion. This is a shocking appraisal of what a wife means to a husband and to her family. The law, as now interpreted by the Majority, places the wife in the same category as the most menial servant, so far as pecuniary appreciation of her services is concerned. In future cases, where this question arises, the jury will be instructed that they must not award a penny for what the husband loses in the companionship of the partner of his worries, hopes and dreams.

In the case of *Fabrizi v. Griffin*, 162 F. Supp. 276,[2] the United States District Court for the Western District of Pennsylvania, which enforces the civil law of Pennsylvania, affirmed a verdict of $65,120 for the pecuniary loss suffered by the husband due to the loss of his wife's services. In describing what constituted the wife's services, the United States District Court,

---

[2] This decision was affirmed by the U. S. Court of Appeals for the Third Circuit, 261 F. 2d 594.

speaking through Chief Judge GOURLEY, said: "The loss of a wife's services are imponderables which, indeed, command almost inestimable values. . . What is the economic value of these intangible services which in many lives draws the distinction between failure and success? The companionship of a woman and a man joined together in Matrimony . . . is the elixir of life to the youth and to the middle-aged, but it is the necessity of life, as oxygen is to the air, to those who are treading the pathway of life in the later years of one's existence on this earth."

Insofar as its being translated into pecuniary value is concerned, a wife's companionship, under the decision of this Court, is now neither elixir nor oxygen. Regardless of the age of the husband, the wife's companionship is currently rated by this Court, in a trespass action, as zero. What kind of law is it that acknowledges a property right to be worth $65,000 one day and then absolutely nothing the next day? Even the most erratic stock market reverse scarcely ever reports such seismological extremes.

In the *Spangler* case, supra, we said categorically: "As between the innocent victim of a wrong and the person who accomplished the wrong, the law imposes on the malfeasor the obligation to make the victim whole in every phase in which the victim has suffered, to the extent that rehabilitation is possible in terms of money."

Is this Court repudiating that just doctrine?

The decision of the Court in this case is as legally incomprehensible as it is logically indefensible. The only question involved in this appeal is whether Mrs. Neuberg is entitled to recover damages for injuries sustained by her husband, injuries which have a direct bearing on her own well-being, health and happiness. This Court was not satisfied to render its decision on that specific question; it proceeded to render decision

on cases which are not before the Court, but which may be pending in the lower courts. It has done what it has stated hundreds of times it will not do, namely, decide questions which are not on appeal. But it has done more.

This Court has said repetitively that when a vital change is to be made in the state of the law, the change must come through action of the Legislature and not through the Courts.[3] It has said this in the matter of making charitable institutions responsible in damages for torts committed by their servants.[4] It has said this with regard to making municipalities responsible for the torts of their servants and agents.[5] It has said this with regard to allowing juries to return dual verdicts in first degree murder cases, although it was this Court which originally pronounced the unjust and grotesque rule that the jury could hear the prior record of a man on trial for his life even before they had decided whether he was guilty of murder.[6]

How does the Majority now justify doing what it refused to do with regard to changing the prior record rule? How does it justify this revolutionary change in liability in trespass actions when it refused and still refuses to make any change in the charitable institution rule and declines to consider changing the rule with regard to responsibility of municipalities for the tort acts of its agents. How does the Majority answer the query of how it can take two identical situations and make fish of one and fowl of another? How does it

---

[3] I do not subscribe to this rule. I believe that if this Court makes a rule, it can change it. However, the Majority talks otherwise, but, as will be noted here, it occasionally talks one way and decides another.

[4] *Knecht v. St. Mary's Hospital*, 392 Pa. 75.

[5] *Boorse v. Springfield Township*, 377 Pa. 109.

[6] *Commonwealth v. Thompson*, 389 Pa. 382. The Legislature has now spoken on this subject. Act No. 594, December 1, 1959, P.L. 1621.

answer the inevitable question which arises: How can it deny sauce to the gander when it ladles it out overflowingly to the goose? The Majority does seek to answer the last question by saying that sauce has no place in the diet of today! It says more; it says that "sauce was never a proper ingredient of the diet."

I respectfully offer the suggestion that the decision of today has made a strange dish of the whole sacred matrimonial relationship. So far as legal recognition is concerned, it has taken all the romance out of married life; it has made of a married couple a simple business partnership. It says in effect that companionship means nothing, love is of no value, society is not recognized, the tender affection between husband and wife has no place in the chronicles of the law. It used to be that when Mary Quadrille married John Cabot, they became Mr. and Mrs. Cabot. Under today's decision, the wedded couple will become Quadrille & Cabot, Partnership. John keeps what is his, Mary keeps what is hers, and if anything happens to one or the other, the remaining partner may not apply to the law for recompense for what is the most precious possession of all, the jewel of companionship.

Under the Married Women's Acts, a married woman is entitled to what she earns, she is entitled to obtain and hold property in her own name, she is entitled to retain her original name. But of what value are these rights if she must give up the bond which holds her husband? If neither spouse can legally claim damages for the loss of the companionship of the other spouse, this amazing legal pronouncement comes close to proclaiming that such companionship has no legally recognized existence. And if the law does not recognize that the sentiment of that companionship is a substantive legal right, then Quadrille and Cabot are indeed only business partners occupying the same intimate quarters.

The Majority Opinion says: "The roots which at one time, if ever, gave nurture and a legitimate birth to the husband's right to assert a claim for loss of consortium have long since wizened and died."

How long is "long since"? We have seen that only a year ago we acknowledged the right of the husband to recover for the loss of his wife's consortium. And how long does it take a right to wizen? Is the atmosphere of this Court's decisions so baleful that, unless rights are tenderly watched, green-housed and watered every few weeks or so they will wizen and die? How are lawyers to initiate legitimate lawsuits if, without notice or admonitory suggestion, the plant of recovery for a given wrong, recognized and proclaimed in the law books, may wizen on the lawyer's way to the courthouse?

Where is the constancy of the law if, overnight, a centuries-old rule may be declared outlawed? What about impairment of contractual obligations? Is marriage not a civil contract as well as a holy obligation? On what theory can this Court put at naught a constitutional prohibition? (Art. I, Sec. 17)? This Court may do what it has done only because it is the highest Court in the Commonwealth, but what it is doing today is still legal usurpation; it is still an abuse of constitutional power; and I wish emphatically to disassociate myself from such arbitrary conduct.

The Majority Opinion says that: "They [the roots previously mentioned] owe their origin to a seed of thought which, when viewed by the eyeglass of the present day, none should accept, much less implant anew." Without wanting to seem to treat lightly what is a very serious matter I can only say that to fail to note a very definite and formidable right which has been part of our law for centuries is to look at it not with the eyeglass of appreciation, but through the glass eye of unaccountability.

On July 2, 1959, just a year ago, as I have already quoted, we said: "Between the innocent victim of a wrong and the person who accomplished the wrong, the law imposes on the malfeasor the obligation to make the victim whole. . ." But does the decision of the Court today make the malfeasor pay for the wrong he has imposed on his innocent victim? The object of a Court decision is to benefit the innocent and punish the guilty. It is to ease the burden of those without fault and require the blameworthy to repair the damage they have done. The decision of today punishes the injured person and rewards the injuring one. The tortfeasor blasts the happiness of an innocent married couple, but he must not be required to pay because to do so would be to look through the eyeglass of the present day which presumably wizens what it looks at when Court-made law arbitrarily decides to destroy the flower of its own creation.

Law is supposed to be the distilment of reason. What reason is it that proclaims that a lawsuit will be accepted if it claims compensation for a scratched finger or for a broken leg but will turn a glass eye on the shattered heart of the most respected relationship in civilization, the marriage relationship, that relationship which has, for its very raison d'etre, companionship, love, devotion and care recognized by law?

For the last half century the law has made extraordinary progress in accepting the biblical precept that "Man shall not live by bread alone", but today's decision proclaims that when a husband loses his wife's companionship, or a wife loses her husband's care, devotion and love, the surviving spouse shall be satisfied with the crust of a few dollars for the material things which have been lost or damaged—and nothing more.

The Majority Opinion speaks of the emancipation of married women from many of the legal incapacities shackled upon her in medieval and common law days,

but does not arrive at any explicable conclusion as to where this development leads. Does the Majority mean that by emancipation a married woman is now less entitled to the protection and devotion of her husband than before? What kind of emancipation is it which gives less rather than more of the world's goods and the happiness which flows from them?

As a matter of history, the common law recognized woman's right to the consortium of her husband. The only reason she could not sue for the loss of it was the technical barrier presented by the legal fiction that husband and wife were one.[7] "Nevertheless her right existed."

The Majority Opinion says: "That the woman today is not regarded as she was at common law is too obvious for comment. The husband's right to recover on this theory is without present day justification. The historical fictions have been shattered. The pillars which for decades had been regarded as lending support to this monument to the lord are today so effectively undermined by remedial legislation which recognizes the status of the wife as equal to that of her spouse that, in an increasing number of jurisdictions, they are being razed rather than looked to for further and extended service."

Somewhere along this argument I sense something disturbingly wrong but I cannot seem to put my finger on it. Is it because of the metaphor of the pillar supporting a monument to the lord? I presume the Majority Opinion refers to the husband as the "lord", but what of the remedial legislation? The remedial legislation was not aimed at toppling over the husband. The husband is still the head of the household, he is still the person responsible for the security of the home,

---

[7] *Eliason v. Draper*, 1910, 2 Boyce 1, 25 Del. 1.

he is still the protector of his wife and children, all of which, of course, he should be.

In point of historical reality and visual observation, the remedial legislation referred to by the Majority has strengthened the pillars upholding the solidarity of the home and the family life. The remedial legislation which has conferred upon the wife certain rights denied her in the past has increased rather than diminished the strength of the bonds of mutuality between her and her husband. If it did not do that, it could scarcely be regarded as "remedial." Anything which weakens the marital status is catastrophic, not remedial.

The pillars supporting the dignity of the home and the family have been reinforced, not undermined, by the remedial legislation referred to by the Majority. The decision of today, however, like a misguided Samson, is shaking those pillars which uphold the beauty, the sacredness and the sentiment built into the mansion of family life.

I would not extend this opinion to inordinate lengths by citing, analyzing and quoting from numerous decisions throughout the country which allow recovery for the loss of consortium, both to the husband and the wife. I would, however, invite attention to the monumental decision of the United States Court of Appeals, District of Columbia, in the case of *Hitaffer v. Argonne Co., Inc.,* 87 U.S. App. D.C. 57, where the Court, after learnedly and exhaustively considering the principal decisions on the subject, said: "The husband owes the same degree of love, affection, felicity, etc., to the wife as she to him. He also owes the material service of support, but above and beyond that he renders other services as his mate's helper in her duties, as advisor and counselor, etc. Under such circumstances it would be a judicial fiat for us to say that a wife may not have an action for loss of consortium due to negligence."

The Court of Appeals of Georgia, in acknowledging a similar right in the wife for loss of consortium, quoted the opinion in the *Hitaffer* case in its entirety in the case of *Brown v. Georgia-Tennessee Coaches, Inc.,* 77 S.E. 2d 24, and then ended with this superb statement which cannot be refuted: "It is as much the duty of this court to restore a right which has been erroneously withheld by judicial opinion, as it is to recognize it properly in the first instance. It is appropriate in this day, when human rights are on the tongues and in the hearts and minds of men, women and children everywhere, and when the very existence of civilization depends on whether fundamental human rights shall survive, for this court to recognize and enforce this right of a wife, a right based on the sacred relationship of marriage and home. Answering the defendant in error's argument, we do indeed have a 'charge to keep,' but that charge is not to perpetuate error or to allow our reasoning or conscience to decay or to turn deaf ears to new light and new life."

This Court, I am proud and happy to say, has, during recent years, made tremendous strides in writing principles of humanity into the jurisprudence of the Commonwealth, but I am sorry to say that, with today's decision, it has taken a backward step which makes many bad features of the Common Law seem desirable in comparison.

I have written many dissenting opinions but this one fills me with weariness and almost despair. It seems impossible that in this era of enlightened acknowledgment of the eternal verity that the worth of happiness in this earthly existence is made up of more than the perishable material things, the highest Court of this Commonwealth and the oldest Supreme Court in the United States, should deal a shattering blow which reduces the holy relationship of married life to one of a mere business partnership.

I believe that this wholly insupportable decision of today warrants the attention of the Legislature and that at its next session it should consider passing legislation which will restore to the husband, and grant to the wife, the right to compensation for destruction of the keystone of a happy family life, the very keystone which sustains the arch of sentiment, care, love and devotion which holds the family together.

And until that legislation is enacted, or this Court repudiates, by overruling, this incredible decision of today, I shall dissent from every decision which this Court makes, denying to husband and wife a right which is the very badge of holiness between man and wife in the eyes of the law and the goddess of morality and justice.