MARTIN THOMAS YONNER, Plaintiff, v. JOSEPH FRANKLIN ADAMS, Defendant.

■■■

■■■

■■■

■■■

(*February* 6, 1961.)

STOREY, J., sitting.

*E. N. Carpenter, II, William E. Wiggin* and *James P. D'Angelo* for the plaintiff.

*William F. Taylor, H. James Conaway, Jr.,* and *Newton White* for the defendant.

Superior Court for New Castle County, No. 6, Civil Action, 1960.

STOREY, J.:

This action arose as the result of an automobile accident. Both plaintiff and defendant are married men. Each was driving his own car. Plaintiff was alone; defendant was accompanied by his wife and children; all suffered personal injuries; and defendant's wife died. Plaintiff brought suit for his injuries alleging defendant's negligence. Defendant answered the complaint and filed a counterclaim for his own injuries and for his wife's wrongful death, alleging plaintiff's negligence and the last clear chance. Then plaintiff's wife came forward with a motion to intervene and to amend the complaint by adding a claim for loss of her husband's consortium. There being no objection, this motion was granted. Whereupon, defendant filed a motion to dismiss the claim of plain-

tiff's wife on the ground that said claim failed to state a cause of action upon which relief might be granted.[1]

Therefore, the primary question is whether, under Delaware law, a wife has a remediable cause of action for her loss of consortium against a third party tort-feasor who has *negligently* injured her husband.

The defendant argues that this question was settled in this Court in *Sobolewski v. German, Del. Super.* 1924, 2 *W. W. Harr.* (32 *Del.*) 540, 127 *A.* 49, wherein Judge Rodney used the following Language:[2]

"It is true that *Eliason v. Draper*, 2 *Boyce* 1 at 9, 77 *A.* 572, holds that the right to the consortium of a husband was recognized at common law as a right inherent in the wife which could not be enforced by her except under the provisions of the Married Women's Act. The cause of action there involved, as well as in *Lupton v. Underwood*, 3 *Boyce* 519, 85 *A.* 965, was an injury or direct attack on the marriage relation itself. The authorities are so uniform that no right of action existed at common law for loss of consortium of the husband due to a negligent injury that a mere citation of the authorities must be sufficient." [Citing cases from other jurisdictions.]

Defendant urges that the above language was part of the *Sobolewski* holding and hence controlling under the doctrine of *stare decisis;* or, should it be only dictum, then it is strong and persuasive dictum entitled to the type of respect accorded dictum in *DuPont v. Peyton, Del. Ch.* 1927, 15 *Del. Ch.* 255, 136 *A.* 149, 154. On the other hand, intervening plaintiff

---

[1] There are other motions in this case which need not concern us at this time.

[2] 2 *W. W. Harr.* (32 *Del.*) at page 548, 127 *A.* at page 52.

characterizes the quoted language as mere dictum and urges that it be disregarded. And so, we have our first problem.

*Sobolewski v. German* resolved a procedural question under our old rules. The suit was instituted as a *capias ad respondendum*, with $10,000 bail required of defendant. The cause of action was for the wrongful death of plaintiff's husband under our version of Lord Campbell's Act. Plaintiff filed an affidavit in support of the *capias* wherein she alleged: that defendant was negligent in injuring her husband; that her husband died as a result of defendant's said negligence; and that her husband had brought no suit in his lifetime to recover damages for said fatal injuries.

Defendant's motion to set aside the writ of *capias ad respondendum* was predicated upon four contentions, only one of which is pertinent to our case. In that instance, he argued that the writ was issued upon an improper affidavit since plaintiff did "not allege that the cause of action was 'an injury to the person or property accompanied by violence to the party plaintiff but an injury to the person of a third party.' " [2 *W. W. Harr.* (32 *Del.*) 540, 127 *A.* 50.]

In resolving this issue, Judge Rodney first looked to the statutes. Section 4093 of the Revised Code of 1915, 10 *Del. C.* § 3108, was our only provision relative to *capias*. However, there was an exception provision in that section which, *inter alia*, provided that the statutory provisions on *capias* procedure could not apply where the case was one for "injury to the person or property, accompanied by violence, if any affidavit of the cause of action be filed with the praecipe." Since the suit was viewed by the Court as being under our Wrongful Death Act (Section 4155 of the Revised Code of 1915, 10 *Del. C.* § 3704), the Court felt that if a *capias* could lie for any reason it must of necessity come within the exception clause as an "injury to the person". This being so, it was excepted from the normal statutory regulations on *capias* and the Court

was forced to look to the common law as modified by Delaware practice. This gave rise to the Court's scholarly analysis of the common-law development of· *capias* procedure. From this base, the judge handed down one of his holdings, and then proceeded to the point with which we are here concerned.

His problem involved an interaction of the Wrongful Death Act (Section 4155) with the exception provision of the *capias* statute (Section 4093). To tie-up this point, he analyzed the nature of a claim under the Wrongful Death Act. The provisions of the Act were found to be unknown to the common law, and, hence, strictly statutory. The Act had two facets. In the first instance, it was merely a survival or anti-abatement provision which overrode the common-law rule that a claim did not survive the death of the injured party. Therefore, had plaintiff's husband instituted suit in his lifetime by *capias*—which would have been a proper common-law procedure—then his wife, upon his death, would have succeeded to his claim, as his personal representative, and so would have found herself properly prosecuting a claim which had been duly instituted by *capias*. Such a claim would have been founded upon the wrongful injury to the person of the deceased husband and since such an injury would have been an "injury to the person * * * accompanied by violence" it would have come within the exception clause of the *capias* statute.

However, it was found that a different condition would exist where the injured husband had not instituted suit within his lifetime. Such was the case in *Sobolewski*. In such a situation a widow could institute suit under the second facet of the Wrongful Death Act. But such a suit would be of a different character than where the injured husband had himself instituted it. Under the second facet, it would *not* be a suit for injuries to the person of the deceased husband, but, instead, would be a suit to "recover damages for the death and loss

thus occasioned," an entirely statutory cause of action. This was the nature of Mrs. Sobolewski's action. Hence the question as to whether such a claim formed the proper basis for a *capias under* the language of the exception provision: "injury to the person or property accompanied by violence." .

Thus, we have set the stage to resolve the question as to what portion of the Judge's language was holding and what portion was dictum. It is essential to remember that the primary question involved a construction of the exception provision in the *capias* statute. This provision referred to both an injury to the person and an injury to the property. So there were, at most, two main questions to resolve.

Relative to the "person" aspect, the Judge held that the quoted words refer to "injuries to the *person of the party plaintiff* in the suit begun by capias." This had the effect of excluding plaintiff's suit on a *capias* writ, since she was suing under the second facet of the Wrongful Death Act, which, as we have seen above, was certainly not a suit for injury to *her* person and, indeed, was not even a suit for injury to the person of her husband, but rather was a suit for "the loss occasioned by the death". This was most certainly a holding, since it resolved the issue as delimited by the Court in the beginning of its opinion (2 *W. W. Harr.* (32 *Del.*) at page 543, 127 *A.* at page 50) when it said:

"It is apparent, of course, that the cause of action in this case is embraced within the provision at the end of the statute above quoted [the *capias* exception clause, Section 4093] as being 'an injury to the *person* accompanied by violence' * * *." (Emphasis added.)

Now, accepting this last-quoted language at its face value, and also noting that defendant's objection, as quoted above, says that plaintiff's affidavit did not allege injury to her person or property but only alleged injury to the *person of her husband,* and further observing that it was, after all, the defendant's mo-

tion which defined the issue, then it would seem, to my mind, that the Judge had thus resolved the only issue properly before him; for should it be assumed that his delimiting language properly defined the issue placed before him by the pleadings, then it seems to me that his function was complete when he ruled that "injury to the person" meant injury to the person of the party plaintiff. This would seem to have the effect of making any determination of the "injury to the * * * property" question a matter of dictum, since the "property" question apparently had not been raised in the pleadings and motions.

Notwithstanding this, the Judge did hear and determine an argument relative to this "property" question. Plaintiff's "property" argument was framed and ruled upon on the basis of two separate contentions. Plaintiff's primary point was that she had a property right in her husband's consortium which had been injured by violence so as to support a *capias* writ under the exception clause (4093), and that this *capias* could issue (a) under a Wrongful Death suit (second facet), or (b) under an independent consortium action separate from a Wrongful Death Claim.

Relative to a claim for consortium *per capias* under the Wrongful Death Act (second facet), the Court ruled against the plaintiff on the grounds that a suit under the second facet of the Death Act was a new cause of action created in her favor by statute. It depended upon the right of her injured husband to bring a suit for injuries in his lifetime; *i.e.* she could not sue for his death, unless he could have sued for injuries had he not died. From this, the Court concluded that:

"It being apparent that no action based on loss of consortium or damage to property could have been brought by the deceased, consequently, no such action can be maintained by the wife." 2 *W. W. Harr.* (32 *Del.*) at page 543, 127 *A.* at page 52.

The Court cited no supporting authority. However, I note, strictly by way of dictum, that the Court seems to have said that once death has occurred, without suit being brought by the injured party, then a widow, and presumably a widower, could not sue for loss of consortium, because a separate, and probably exclusive remedy was provided in the Death Act. I also note, that the Court ruled that a second facet Death Act claim was a suit for "the loss occasioned by the death", and, by way of dictum, I question whether such a loss does not embrace the loss of consortium, which certainly is a loss occasioned by the death in such a case. My conclusion on this issue is that Judge Rodney's analysis of this last point was very probably dictum, and, one way or the other, it is not controlling on me at this time, since it involved a consortium claim under the Wrongful Death Act (second facet) with which I am not here concerned.

The last phase of the plaintiff's "property" argument dealt with a consortium suit per *capias* as brought *independent* of the Death Act. This argument was clearly irrelevant, since the Court positively stated that the suit of Mrs. Sobolewski was *under* the Death Act. Therefore, it follows that the Court's ruling on this point was *obiter dictum*. The Court's language in ruling on this issue is set forth in the third paragraph at the beginning of this opinion. As to this point, I conclude that I am not bound under the doctrine of *stare decisis* to follow said language. But though I be not bound by *stare decisis*, I must still determine whether the language truly reflects the status of Delaware law, so as to be effectively persuasive in this case.

Judge Rodney's two Delaware precedents on the consortium question were *Eliason v. Draper, Del. Super.* 1910, 2 *Boyce* (25 *Del.*) 1, 77 *A.* 572; and *Lupton v. Underwood, Del. Super.* 1912, 3 *Boyce* (26 *Del.*) 519, 85 *A.* 965. In each case a female defendant was being sued by a married woman plaintiff upon the claim that she did alienate the affections

of the plaintiff's husband, thereby depriving plaintiff of her right to her husband's consortium. Judge Rodney distinguished these cases upon the theory that an alienation of affections involved a direct and wilful assault upon the wife's right to consortium as contraposed to a negligent assault upon the consortium, as existed in *Sobolewski*. However, upon reading those cases, particularly *Eliason*, I am of the opinion that the distinction was too tightly drawn.

In *Eliason v. Draper*, Judge Woolley was apparently exploring a new conceptual approach in Delaware law. His primary concern was an alienation of affections suit, but such a suit was of necessity predicated upon the legalistic concept of a loss of consortium. The loss of consortium was the generic legal framework within which was embraced the specific claim for alienation of affections. This is a sound logical classification, and there can be no doubt that Judge Woolley employed it in his analysis.

The learned Judge analyzed the common-law status of married women and found that their disabilities of coverture affected them in two pertinent ways insofar as an alienation of affections suit was concerned. No married woman could sue in tort for injuries to her person or property unless her husband was joined in the action. This was an all-embrasive disability relative to all tort actions. Needless to say, a suit for loss of consortium is *per se* a suit in tort for a property damage. Furthermore, within the generic grouping of suits for loss of consortium, there was a specific claim which was barred to her by an additional disability of coverture. Namely, she could not sue for alienation of affections *with* the joinder of her husband, for he was barred from such a joinder by virtue of being *in pari delicto* with the defendant and, therefore, because of his common-law identification with his wife, would share in the fruits of his own wrongdoing should his wife recover damages against the defendant. Hence, for an alienation of affections suit, a wife was doubly barred at common law, (a) because she could not sue for any tort

without her husband's joinder, and (b) because he was not permitted to join her in a suit for that specific tort.

The Court's problem was one of statutory construction; and in holding that our Married Women's Acts effectively removed the abovesaid common-law disabilities of coverture, the Court made some very pertinent observations. Relative to the generic grouping of loss of consortium as distinguished from the specific tort of alienation of affections, the Court said [25 *Del.* 1, 77 *A.* 575]:

"It has never been disputed that at common law it was the right of the husband to have and hold the affection, society, aid and comfort of his wife, and it is admitted that the law also gave him a right of action against one who interfered with that right by enticing away his wife and alienating from him her affection. * * * The *basis of such an action was,* as it is now, *the loss of consortium* or the right of the husband to the conjugal society of his wife." (Emphasis added.)
This clearly indicates that Judge Woolley saw the *Eliason* case as being within the framework of the overall consortium concept. He then went on to observe that:

"The right of the wife to the *consortium* of the husband was likewise recognized at common law as an existing right of the married woman, though a right of action for its invasion was denied her because of the common-law doctrine of identity of person and its consequent trammels of technical procedure * * *. 'That the common-law courts failed to find a remedy is, under the decisions, rather a recognition of the right, than a denial of its existence. * * *' *Sims v. Sims* [79 *N. J. L.* 577] 76 *Atl.* 1063." (Emphasis added.)

Judge Woolley then cited with favor the language of Lord Campbell as quoted in the case of *Lynch v. Knight,* (1861) 9 *H. L. C.* 577, 11 *Eng. Rep.* 854 at 859, as follows:

" 'Nor can I allow that the loss of consortium or conjugal society can give a cause of action to the husband alone.

[* * *] I think it may be a loss which the law may recognize to the wife as well as to the husband'."

In conclusion, Judge Woolley approved of various previously cited authorities which supported the proposition that:

"* * * the right of a wife to the consortium of her husband is a property right, and that statutes giving a married woman the right to sue alone in respect to her property give to her alone a right of action in tort for an injury to her property right of consortium. * * * [Under our Married Women's Acts] any married woman may maintain an action in tort for the redress of an injury to her property right in her husband's consortium."

There can be no doubt that Judge Woolley viewed his alienation of affections problem as but a specific aspect of the overall consortium problem. To honor the alienation of affections claim, he first had to resolve the consortium question as a generic class. This he did. His language is almost exclusively devoted to the generic class of consortium claims. He specifically deals with alienations of affections only when it is necessary to treat of that second aspect of common-law disabilities of coverture inherent in such particular and specific claims. In other words, my reading of the *Eliason* case shows that Judge Woolley first found that a wife had a valid claim under the generic class of tort claims for loss of consortium, thus overcoming the general disability of her coverture for any tort claim, and then went on to hold that she also had a valid claim under the specific subdivision of alienation of affections claims, thereby overcoming the second disability of coverture for alienation of affections claims, as noted above. This renders inapposite the distinguishment of Judge Rodney in *Sobolewski v. German, supra.*

In the case of *Lupton v. Underwood, Del. Super.* 1912, 3 *Boyce* (26 *Del.*) 519, 85 *A.* 965, 972, I find equally strong

support for the proposition that no delimitation on general consortium claims was intended by our alienations of affections precedents. In *Lupton* it had been argued by plaintiff in her prayers that:

"* * * the alienation or loss of affection is not the substantive cause of action but a matter of aggravation of damages, the gist of the action being the loss of the consortium, that is, loss of aid, support, protection, comfort and society of her husband."

This argument apparently was favored by the Court, for Judge Boyce in charging the jury used the following language:

"Whoever * * * by the alienation of the affections of a wife's husband, deprives her of his affections, commits a wrong against her property rights for which such wrongdoer is liable to respond in damages. *Eliason v. Draper*, * * *.

"The basis of the action is the loss of conjugal fellowship, society and aid of the husband. The *actionable* consequences of the injury of the wrong, whenever committed, is *the loss of consortium*, and alienation of affections is a matter of aggravation." (Emphasis added.)

After full consideration of both the *Eliason* and *Lupton* cases, I can summarize my impression as follows: Judge Woolley and Judge Boyce each seem to have been dealing with the generic class of loss of consortium claims, with no distinction as to how the loss had been engendered. Their analyses were colored by the alienations of affections aspect only when necessary to point out the particular qualifications inherent therein. Though it might be argued that they never said, in so many words, that a wife has a cause of action for loss of consortium against a person who has negligently injured her husband, there is a very strong inference in their language and

logic—particularly Judge Woolley's—as would go far to support such a proposition.[3]

Having reached the conclusion that Judge Rodney's language in *Sobolewski v. German* is *obiter dictum*, I am in a position to conclude that this is technically a case of first impression in this jurisdiction, but that the cases of *Eliason v. Draper* and *Lupton v. Underwood* provide an adequate inferential base upon which could be founded the proposition that a plaintiff wife *does* have such a cause of action as herein contended.

However, I wish to make it clear that what I say herein is not meant to disparage Judge Rodney, for it must be recognized that his observation was in conformity with the gist of the vast majority of judicial expressions upon the question as of the year in which *Sobolewski v. German* was decided. It is stated in the annotation on this subject in 23 *A. L. R.* 2d 1378, at page 1380, that:

"Prior to the decision in *Hitaffer v. Argonne Co.* (1950) 87 *App D C* 57, 183 *F* 2d 811, 23 *A L R* 2d 1366, cert den 340 *U S* 852, 95 *L ed* 624, 71 *S Ct* 80,[4] which upheld the wife's right of action for loss of consortium due to the defendant's negligence, * * * only one jurisdiction, North Carolina, had indicated a departure from the rule barring such an action,

---

[3]See *Hoekstra v. Helgeland, S. D.* 1959, 98 *N. W.* 2d 669, at page 674, wherein the Supreme Court of South Dakota adopted the view that a wife *did* have a remediable cause of action for loss of her husband's consortium through defendant's negligence. In formulating its opinion, the Court cited *Eliason v. Draper,* quoting some of the language I have set forth, as being indicative of the true common-law rule that the wife had the same interest in her husband's consortium as he had in hers, albeit she had no remedy under common-law procedure. See also the most lucid dissent of Mr. Justice Musmanno in *Neuberg v. Bobowicz,* 1960, 401 *Pa.* 146, 162 *A.* 2d 662, at page 676, wherein the learned Justice cites Eliason to the same effect as did the Hoekstra opinion.

[4]My footnote: *Hitaffer v. Argonne Co.* was reversed in parts not herein pertinent by *Smither & Co., Inc. v. Coles,* 1957, 100 *U. S. App. D. C.* 68, 242 *F.* 2d 220.

and this defection was promptly corrected at the earliest opportunity."

Delaware has frequently been cited by text-writers and glossators as being in the ranks of this majority position, by virtue of the language of Judge Rodney in *Sobolewski v. German, supra,* herein determined to have been dictum. In view of this fact, it seems necessary to re-axamine our position on the subject.

I have already observed that Judges Woolley and Boyce in the cases of *Eliason v. Draper* and *Lupton v. Underwood,* respectively, propounded concepts of a very embrasive nature. Their above-quoted language was the very essence of their respective opinions. They treated of a wife's right of action for loss of consortium as a generic tort grouping, and expressed no exceptions to its being fully equal with her husband's corresponding right. The *ratio* decidendi of their analysis required this general treatment and their results are flavored with a most liberal and enlightened spirit. These cases afforded the basis of Delaware precedent in the field, precedents all the more powerful because they were so inimicably wedded with the issue properly at bar.

Judge Rodney distinguished these precedents, and to fill the void thus created, he relied upon authority from other jurisdictions. This authority upon which he relied was representative of the majority view in 1924, and it remains so to this day. Notwithstanding the fact that *Eliason* and *Lupton* had provided the basis for him to take what is, to my mind, a more acceptable position, he apparently preferred to adopt the majority view.

I have been urged to follow this majority position. It has been argued that were I to adopt any other course, I would create an unstable condition. This argument appears to ring a hollow note. Even assuming that I could wipe from my mind the import of Judge Woolley's language in *Eliason,* I would still be unable to surrender to defendant's imaginary

specters. His argument is not new, and usually it has some validity; but occasionally, as here, it must be disregarded. Such an argument was answered by Mr. Justice Smith in his commendable opinion in *Montgomery v. Stephan*, 1960, 359 *Mich.* 33, 101 *N. W.* 2d 227, at page 228 when he said:

"These precedents are venerable. Their chains may be moss-encrusted and rusty but only a few courts have held that they no longer control or confine. Thus again we reach the conflict that divides us, for the law, as Dean Pound put it, must be stable, and yet it cannot stand still. Were we to rule upon precedent alone, were stability the only reason for our being, we would have no trouble with this case. We would simply tell the woman to begone, and to take her shattered husband with her, that we no longer need be affronted by a sight so repulsive. In so doing we would have vast support from the dusty books. But dust the decision would remain in our mouths through the years ahead, a reproach to law and conscience alike. Our oath is to do justice not to perpetuate error."

It is my judgment that the clue to the correct rule lies in such an opinion as is set forth in *Eliason v. Draper*, and the modern exponents of that position follow from the leading case of *Hitaffer v. Argonne Co.*, 1950, 87 *U. S. App. D. C.* 57, 183 *F.* 2d 811, 23 *A. L. R.* 2d 1366, certiorari denied 340 *U. S.* 852, 71 *S. Ct.* 80, 95 *L. Ed.* 624.[5] This modern recognition

---

[5]See footnote 4. Cases following the lead of *Hitaffer v. Argonne Co.* are: *Brown v. Georgia-Tennessee Coaches, Inc.* 1953, 88 *Ga. App.* 519, 77 *S. E.* 2d 24; *Cooney v. Moomaw, D. C. D. Neb.* 1953, 109 *F. Supp.* 448; *Acuff v. Schmit*, 1956, 248 *Iowa* 272, 78 *N. W.* 2d 480; *Missouri Pacific Transportation Co. v. Miller*, 1957, 227 *Ark.* 351, 299 *S. W.* 2d 41; *Hoekstra v. Helgeland, S. D.* 1959, 98 *N. W.* 2d 669; *Montgomery v. Stephan*, 1960, 359 *Mich.* 33, 101 *N. W.* 2d 227. See also Mr. Justice Musmanno's most cogent dissent in *Neuberg v. Bobowicz*, 1960, 401 *Pa.* 146, 162 *A.* 2d 662.

Text writers and contributors to law reviews have almost unanimously supported the minority position, granting a wife's recovery. See in particular *Prosser on Torts* (2nd Ed.) § 104; 1 *Harper & James, Torts*, § 8-9; *Fridman, Consortium as an "Interest" in the Law of Torts*, 32 *Can. B. Rev.* 1065; *Holbrook, The Change in the Meaning of Consortium*, 22 *Mich. L. Rev.* 1; *Lippman, The Breakdown of Consortium*, 30 *Col. L. Rev.* 651; *Simeone, The Wife's Action for Loss of Consortium*, 4 *St. Louis, U. L. J.* 424.

of the wife's claim has been propounded and explained in some very learned opinions. Taken as a whole, these opinions have completely covered the point. It is difficult to see what more can be said. I have cited them in footnote 5.

In *Eliason v. Draper* [25 *Del.* 1, 77 *A.* 573], Judge Woolley analyzed the status of a married woman at common law. I quote his language:

"In its *early* stages the common law enveloped the identity of the wife and all of her possessions in the *personalty* of her husband. The husband and wife were considered as one person and the wife's legal existence was merged and suspended during union. She had no will, and without her husband's authority could do no act. The rights and duties which were hers at marriage became his while the union lasted. In her property and its income he acquired either a qualified or absolute interest which excluded her from its enjoyment and control. She was unable to bring an action at law for the redress of an injury sustained in respect to her person or property, either in contract or in tort, unless with her husband's assent and participation, and she could not be sued except when her husband was sued with her. With the aid and joinder of her husband, a remedy was afforded her generally for torts committed against her. * * *." (Emphasis added.)

But, as of the time he wrote his opinion in 1910, Judge Woolley treated of the common law as it had evolved, and he found that it was undisputed that the common law recognized "the right of the husband to have and hold the affection, society, aid and comfort of his wife", and when this right was interfered with, the husband had a cause of action, the basis of which was "the loss of consortium or the right of the husband to the conjugal society of his wife". Judge Woolley further found, as we have seen above, that a like right *had come to be* recognized at common law as being inherent in the wife, though, of course, her disabilities of coverture precluded her

from an independent remedy. In construing the effect of the Married Women's Acts upon the wife's disabilities of coverture, the Judge noted that:

"The confusion of opinion upon this subject evidently has been occasioned by confusing a married woman's rights with her remedies, and considering the removal of her disabilities of coverture designed by modern legislation from the standpoint of her former remedies rather than from the standpoint of her former rights."

He avoided this confusion himself. He had analyzed the precedents in the field and had divided them into four main classes. In summarizing the holdings in the second class of cases, he found that they had upheld suits by wives for loss of consortium through alienation of affections because "the right of a husband and wife to the society of the other is reciprocal", whereupon it was reasoned that "the broad plane of the equality of husband and wife before the law" necessitated that an equality of rights should insure an equality of remedies.

Of the precedents in the fourth class, he said that they "recognize the right of a husband to the consortium of his wife as a property right, and reason that with respect to matters of conjugal society and affection the husband owes to the wife all that she owes to him; and upon the same principle the wife's right is a property right."

I view Judge Woolley's choice of phraseology as being rather significant. This is so because he was outlining and synthesizing his interpretation of the common-law precedents to be found in other jurisdictions in 1910. The above-noted second and fourth class of cases seem to have been the ones he most favored, and, indeed, he claimed that the opinion of this Court in *Hatton v. Wilmington City Ry. Co., Del Super.*, 1901, 3 *Penn.* (19 *Del.*) 159, 50 *A.* 633, was supported by the cases in his fourth class. In choosing his language by

which to characterize these two significant classes of cases, and in bringing his holding into the perimeter of their philosophy, as construed, he declared the common law for this jurisdiction on the basic issue of consortium as of the year in which he wrote. This precedent making determination was the basis upon which he was able to render his holding that the Married Women's Acts had annulled a wife's common-law servitude of marriage, and emancipated her from her common-law disabilities of coverture to the end that "any married woman may maintain an action in tort for the redress of an injury to her property right in her husband's consortium."

If I have tended to be somewhat overly analytical of the *Eliason v. Draper* case, I have done so with a purpose. I have sought to make it abundantly clear that Judge Woolley either positively stated or strongly implied that his interpretation of common-law developments indicated that in his time wives had come to hold a position of dignity in the marital relation that assured them exact parity with their husbands in matters of consortium. Thus, the Married Women's Acts had merely to remove the procedural restraint of the common law so as to assure them equal remedies for the protection and enforcement of their already equal rights. It is my view that these declarations of Judge Woolley in 1910 interpreted and settled the common-law rule for this jurisdiction. That they may be at variance with parallel interpretations in our sister states is of little or no moment, for:

"It is well settled that the common law of a state may differ from that of other states or may even vary from time to time in order to meet the peculiar, and perchance varying, conditions and circumstances of the state."[6]

---

[6]*Thompson v. Andrews,* 1917, 39 *S. D.* 477, 165 *N. W.* 9, at page 12, as quoted in *Hoekstra v. Helgeland, S. D.* 1959, 98 *N. W.* 2d 669, at page 670.

The motto "equal rights demand equal remedies" is the distilled essence of my attitude; and I consider it to be expressive of the spirit of *Eliason v. Draper.* Judge Woolley failed to mention recovery for negligent injury to the consortium, but such would not appear to have been necessary. This is so, because the common law had completed several evolutions since Blackstone's time. When that learned commentator wrote his great work, the law was such as to require him to state:

"Injuries that may be offered to a person, considered as a husband, are principally three: Abduction, or taking away a man's wife; adultery, or criminal conversion with her; and beating or otherwise abusing her. * * * The third injury is that of beating a man's wife, or otherwise ill-using her; for which, if it be a common assault, battery, or imprisonment, the law gives the usual remedy to recover damages, by action of trespass *vi et armis*, which may be brought in the names of the husband and wife jointly; but if the beating or the maltreatment be very enormous, so that thereby the husband is deprived for any time of the company and assistance of his wife, the law gives him a separate remedy by an action of trespass, in the nature of an action on the case, for this ill usage, *per quod consortium amisit*, in which he shall recover a satisfaction in damages."[7]

We are concerned with injuries to the body, and Blackstone covered such injuries in his third class. These injuries, in his time, had to be beatings, or ill-usage, causing prolonged incapacitation. They were wilful and direct. But by the time Judge Woolley decided *Eliason v. Draper* in 1910, there was no question that the husband could also recover where his wife had suffered a negligent injury. *Townsend v. Wilmington City Ry. Co., Del. Super.* 1907, 7 *Pennewill* (23 *Del.*) 255,

---

[7] 3 *Blackstone Comm.* 139; see also 1 *Bacon, Abr.* 502; 1 *Chitty, Pl.* 49.

78 *A.* 635; 1 *Cooley, Torts* (3d Ed. 1906) 469. Believing as I do, that the philosophy of Woolley was that husband and wife had equal rights to the consortium of the other, and that equal rights demanded equal remedies—as provided for by the Married Women's Acts—*then* the syllogism completes itself; for since the husband had a remedy for loss of consortium through negligent injury to his wife, it must logically follow that she had a like remedy.

Furthermore, I note that *Eliason* gave the wife recovery for loss of consortium via the wilful media of alienation of affections. Recovery for such wilful injuries are firmly honored, and I am completely unable to see any "sound reason for allowing a recovery where the act complained of is wilful and not allowing a recovery where the action is based on negligence."[8] To be sure, an abundance of cases may be cited where the Courts have denied her remedy, on one pretext or another. Clark, C. J. dealt with this problem in *Hitaffer v. Argonne Co., supra,* and I endorse his analysis and conclusions. In following and completely adopting the *Hitaffer* position, the Georgia Court of Appeals concluded its opinion in *Brown v. Georgia-Tennessee Coaches, Inc., supra,* footnote 5, with the following statement [88 *Ga. App.* 519, 77 *S. E.* 2d 32]:

"It is as much a duty of this court to restore a right which has been erroneously withheld by judicial opinion as it is to recognize it properly in the first instance. It is appropriate in this day, when human rights are on the tongues and in the hearts and minds of men, women, and children everywhere, and when the very existence of civilization depends on whether fundamental human rights shall survive, for this court to recognize and enforce this right of a wife, a right based on the sacred relationship of marriage and home. An-

---

[8]*Missouri Pacific Transportation Co. v. Miller, supra,* footnote 5. [227 *Ark.* 351, 299 *S. W.* 2d 47.]

swering the defendant in error's argument, we do indeed have a 'charge to keep', but that charge is not to perpetuate error or to allow our reasoning or conscience to decay or to turn deaf ears to new light and new life."

This places me in a position to dispose of that line of authority as typified by *Neuberg v. Bobowicz*, 1960, 401 *Pa.* 146, 162 *A.* 2d 662, wherein it is held that neither the husband nor the wife should be permitted to sue for consortium. They note, as did Judge Woolley, that at ancient common law the wife's status *vis-à-vis* her husband was virtually one of complete servitude. They then construe the basis of the original suit for consortium in the husband as being based upon this concept of the wife as a chattel. It is then reasoned that since the wife is no longer viewed in such a medieval light, the basis for the original action no longer exists. They, therefore, conclude that the basis for the husband's action having disappeared, he should be barred from such "anomalous" suits. In other words, they view the evolution of the wife's equality as tending to destroy the husband's suit, and not as tending to give her comparable rights and remedies.

The difficulty with such a syllogism is that it fails to consider a basic premise, namely, the effect of common-law decisions in building upon the original cause of action. Granting arguendo, that the original suit *per quod consortium amisit* was founded upon the principles stated, it does not follow that the basis of the present day action has not been affected by a great number of years of judicial advancement. To my mind, the error made by the majority in *Neuberg* stems from a seeming misconception of the true import of common-law precedents. The common law is a growing, living thing. Being such, it is susceptible to change with an evolving society. To remain static in the face of the changing needs of society would mean that we are unwilling to face up to reality. The *Neuberg* decision fails to account for this natural evolution, and thus its logic is destroyed by a fatal omission.

No matter what consortium actions may have been *ab initio,* they have undergone marked and vitally important evolutions. The decisions of many years have added embellishments to the original action, and each addition was a valid, honored and recognized growth in the common law. The common law on consortium was not frozen with the pleadings and decision in the original action, nor was it frozen in Judge Woolley's time. The *Neuberg* majority found the common law to be in a rather primitive state when *consortium* was first envisioned. Judge Woolley, in 1910, found the common-law base to have been immeasurably broadened and consortium founded upon more noble and dignified human principles. Today, I find the common-law recognition of consortium to be founded not upon the servile status of a chattel-wife in bondage to her feudal lord, but upon the enlightenment of our times and the dignity of the state of holy matrimony.[9] The suit before me today is different from the original suit, characterized in *Neuberg.* Twentieth century consortium is the end result of the labors of common-law judges who have striven throughout the years to provide society with a substantive cause of action for the redress of an injury to a very real and substantive property right. We cannot suffer any pretext to destroy its standing.

In conclusion, I will treat of the damage question. Defendant has commended to me a line of authority which has denied the wife a recovery on the theory of a possible allowance of double damages for the same injury. He cites *Nickel v. Hardware Mutual Casualty Co.,* 1955, 269 *Wis.* 647, 70 *N. W.* 2d 205; and *Deshotel v. Atchison, Topeka & Santa Fe Ry. Co.* 1958, 50 *Cal.* 2d 664, 328 *P.* 2d 449. Reference might also be made to the annotation in 23 *A. L. R.* 2d 1378, at page 1393, § 10.

---

[9] See the dissent of Justice Musmanno in *Neuberg v. Bobowicz* beginning at page 668 of 162 *A.* 2d.

In *Nickel v. Hardware Mutual Casualty Co., supra,* it is argued that the husband [269 *Wis.* 647, 70 *N. W.* 2d 208]:

"* * * is entitled to recover full compensation for all injuries he sustained, including that for being incapacitated, for his inability to care for, protect, and associate with his wife. If she were authorized to recover from the same wrongdoer the damages she has sustained for the same injuries which her husband may recover for and out of which recovery he is presumed to support and care for her, then recovery would be double * * *."

To the same effect is *Deshotel v. Atchison, Topeka & Santa Fe Ry. Co., supra,* wherein it is stated that [50 *Cal.* 2d 664, 328 *P.* 2d 451]:

"A judgment obtained by a husband after he is injured by a third person might include compensation for any impairment of his ability to participate in a normal married life, and, if his wife is allowed redress for loss of consortium in a separate action, there would be danger of a double recovery." The difficulty I find with these analyses is their failure to distinguish the injured husband's personal loss from the separate, distinct and legally recognized loss suffered by his wife. Take the case of a husband who suffers an incapacitating injury to his reproductive organs. In his personal injury suit it is clear that his damages are predicated upon *his* physical injury which precludes him from copulation, procreation, and an otherwise full enjoyment of his marital state. However, the wife's loss is just as real as it is distinct. She can no longer enjoy *her* legally sanctioned and morally proper privilege of copulation or procreation, and is otherwise deprived of *her* full enjoyment of her marital state. These are *her* rights, not his.

Should we allow the husband to recover for his personal loss as well as the personal loss of his wife, then I admit that we would have double recovery were we to permit the

wife to sue in her own name for her personal loss already recovered by her husband. But, in light of the Married Women's Acts, I submit that it is error to permit the husband to recover for that which is exclusively the wife's, and I do not believe we have permitted such recovery. Some courts have merely *said* that we have, and on this error have denied the wife recovery for what is rightfully hers. A husband's recovery is as individual as a bachelor's, only in the husband's case, his marital state has clearly created legally recognized reciprocal rights in another person, his wife.

Both the *Nickel* and *Deshotel* cases have muddied their logic by a failure to recognize a distinction between a husband's recovery for his personal injuries and his recovery for loss of earnings resultant from the personal injuries. An injured husband may be deprived of his capacity to earn a living; but so, too, might his bachelor cousin. Presumably, if two men were in all respects equal (except that one was married), and both held identical jobs, and both suffered identical injuries, then it would seem logical to suppose that both would suffer an identical loss of earnings.[10] Generally, the bachelor receives his earnings for his own benefit, exclusively; whereas, the married man is committed to certain obligations by virtue of his status. In either case, the man's earnings were his own; he was the person being paid. Barring certain non-pertinent exceptions, a husband, like any other man, is entitled to pick up his own pay check and make what disbursements he is required to make in the manner he sees fit. To be sure, his wife and family are entitled to their share, but, as a rule, he is entitled to have their ultimate share pass through his hands first. Should he not make proper disbursement, his family

---

[10]Note that some men, such as military personnel, receive certain allowances if they are married; and actuarial tables may make a distinction between the expected life span of bachelors *vis-à-vis* married men. However, such differences are insignificant here, and are readily compensated for.

might have an action for non-support. So, therefore, as a general proposition, I hold that the husband is entitled to sue for all of his loss of earnings to the exclusion of his wife being able to sue for what would ultimately become her *pro rata* share. Having recovered, if he fails to provide for his wife, she may prosecute him for non-support.

If exceptions are required to this general rule on damages, they may be treated as they arise. I have dealt only with negligent non-fatal injuries to the husband. I have deliberately avoided those cases where the husband, or wife, suffers a fatal injury.

Defendant's motion for summary judgment is denied.

On presentation, Order, in conformity with this decision, will be entered.