Jacqueline M. LACY and Daniel C. Lacy, her husband, Plaintiffs,

v.

G.D. SEARLE & CO., a Delaware corporation, Richard Raiber, M.D., Richard Raiber, M.D., P.A., a professional corporation of the State of Delaware, and Wilmington Medical Center, a Delaware corporation, Defendants.

Civ. A. No. 83C–SE–123.

Superior Court of Delaware, New Castle County.

Submitted July 5, 1984.

Decided Oct. 31, 1984.

John G. Abramo, of Abramo & Abramo, Wilmington, for plaintiffs.

Warren B. Burt, Wilmington, for defendants Richard Raiber, M.D., and Richard Raiber, M.D., P.A.

TAYLOR, Judge.

Plaintiffs seek damages against defendants Richard Raiber, M.D., and Richard Raiber, M.D., P.A. [collectively Raiber] alleging medical malpractice by Raiber in connection with services undertaken relative to the use of an IUD by plaintiff Jacqueline Lacy.

Counts IX and X charge that Dr. Raiber is liable under the doctrine of *res ipsa loquitur.* Count IX charges that plaintiff employed Dr. Raiber to remove an IUD which was imbedded in her and that Dr. Raiber undertook to accomplish that result by performing a D & C, that during the procedure plaintiff's uterus was perforated, and that the procedure was under the exclusive control of Dr. Raiber and Wilmington Medical Center. Count X incorporates the previous allegations and adds that as a consequence of the perforated uterus Dr. Raiber performed a hysterectomy upon plaintiff later that same day and that that procedure was under the exclusive control of Dr. Raiber and Wilmington Medical Center.

## I

Dr. Raiber contends that the allegations of Counts IX and X of the complaint which assert *res ipsa loquitur* should be dismissed because they do not comply with 18 *Del.C.* § 6853.

Plaintiff contends that since the motion was not made before answer and the appropriate assertion was not made in the answer but was made several months after the filing of the answer and was not made as an amendment to the answer, it cannot be treated as a motion to dismiss but must be treated as a motion for summary judgment. Relying on this contention plaintiff has submitted an affidavit which attaches a pathologist's report of findings concerning the removed organ.

■ Plaintiff also contends that it is inappropriate for the Court to consider the availability of *res ipsa loquitur* at this stage because Rule 304(c)(1) of the Delaware Uniform Rules of Evidence states:

(1) Whether or not the doctrine [of *res ipsa loquitur*] is applicable should be determined at the close of the plaintiff's case.

According to the Comment which accompanies Rule 304, this procedural instruction is traceable to *Delaware Coach Co. v. Reynolds*, Del.Supr., 71 A.2d 69 (1950); *Dillon v. GMC*, Del.Super., 315 A.2d 732 (1974), *aff'd*, Del.Supr., 367 A.2d 1020 (1976); and *Hornbeck v. Homeopathic Hosp.*, Del.Super., 197 A.2d 461 (1964). The quoted language closely tracks language in *Reynolds.* However, the issue before the Supreme Court in *Reynolds* was whether this Court acted correctly in submitting the issue of *res ipsa loquitur* to the jury instead of granting defendant's motion for directed verdict at the close of plaintiff's evidence. *Hornbeck* arose on motion for summary judgment; it involved a condition of necrosis (a granulating wound) which developed at the site where injection had been given. This Court in *Hornbeck* found that there was no medical testimony to the effect that the condition would not have occurred in the absence of negligence and granted summary judgment in favor of defendants. *Dillon* affirmed the denial of a defendant's motion for summary judgment where the buyer of a new car sought recovery based

on *res ipsa loquitur* for damages caused by defective steering mechanism. The Supreme Court in *Dillon* considered the substantive merits raised by the motion for summary judgment and did not find that the matters should not be raised at the summary judgment stage. I conclude that the stage at which the applicability of *res ipsa loquitur* may be considered should be determined on a case-by-case basis considering the nature of the contentions, the sufficiency of the factual showing and the applicable standards of the doctrine.

■ Dr. Raiber contends that the availability of the doctrine of *res ipsa loquitur* in a medical malpractice case is controlled by 18 *Del.C.* § 6853 which provides:

> ... a rebuttable inference that personal injury or death was caused by negligence shall arise where evidence is presented that that personal injury or death occurred in any 1 or more of the following circumstances: (1) A foreign object was unintentionally left within the body of the patient following surgery; (2) an explosion or fire originating in a substance used in treatment occurred in the course of treatment; or (3) a surgical procedure was performed on the wrong patient or the wrong organ, limb or part of the patient's body. Except as otherwise provided herein, there shall be no inference or presumption of negligence on the part of a health care provider.

Although the quoted language makes no reference to *res ipsa loquitur* the report of the Delaware Medical Malpractice Committee which proposed the legislation states:

> Section 6853 creates presumptions of negligence similar to the legal doctrine of *res ipsa loquitur,* (e.g., the thing speaks for itself) in certain specific factual situations. For example, a foreign object unintentionally left within the body, an explosion or fire occurring during the course of treatment, and surgery performed on the wrong patient or limb.

It will be noted that Rule 304(a)(1) of the Delaware Uniform Rules of Evidence defines *res ipsa loquitur* as "a rule of cir-cumstantial evidence, not affecting the burden of proof, which permits, but does not require, the trier of the facts to draw an inference of negligence from the happening of an accident ...". Since the application of the doctrine of *res ipsa loquitur* results in the drawing of an inference of negligence from the existence of certain established facts, I conclude that the last sentence of § 6853, which bars drawing an inference or presumption of negligence on the part of a health care provider based upon facts which do not satisfy § 6853, makes *res ipsa loquitur* no longer applicable to cases involving health care providers if the facts do not fall within § 6853.

■ Clearly, Dr. Raiber was acting as a health care provider as defined in 18 *Del.C.* § 6801 when he undertook to treat plaintiff as alleged in the complaint and the complaint alleges negligence against him.

§ 6853 specifies three alternative situations under which an inference of negligence is permissible. The only one of these alternatives which bears consideration here is where "[a] foreign object was unintentionally left within the body of the patient following surgery". Plaintiff contends that this case falls within the quoted language because Dr. Raiber, after attempting surgically to remove the imbedded IUD, discontinued the surgery without removing the IUD. Therefore, plaintiff contends that the leaving of the IUD was unintentional and that the IUD was a foreign object left within her body.

■ The first consideration is whether the presence of the IUD in plaintiff's body after the first procedure on December 29, 1982 was a "foreign object ... left within the body of the patient following surgery". That phrase is not elaborated upon in the statute or the Committee report. Florida, in a statute directed toward the subject of health care malpractice, Fla.Stat. § 768.-45(4), provides:

> ... the discovery of the presence of a foreign body, such as a sponge, clamp, forceps, surgical needle, or other paraphernalia commonly used in surgical ex-

amination, or diagnostic procedures, shall be prima facie evidence of negligence on the part of the health care provider. Cf. 1 *Medical Malpractice*, Louisell & Williams, § 1404, p. 14–45, footnote 2. In my judgment, the phrase used in § 6853(1) was used to refer to an object which was not present in the person's body before commencement of the immediate health care provider procedure which was present in the person's body after conclusion of the procedure. In this case the IUD was present in plaintiff's body before the procedure commenced, and hence was not within the meaning of that phrase.

■ The second consideration is whether the object was unintentionally left within the person's body following surgery. This connotes that the health care provider must have not intended to leave the object, that is, that it was left inadvertently. Paragraphs 66 and 67 of the complaint allege that Dr. Raiber attempted to remove the IUD on December 22, 1982 and that on December 29, 1982, while plaintiff was under general anesthetic, he again attempted to remove it, but failed. The clear meaning of those allegations is that Dr. Raiber was aware of the need to remove the IUD but was unable to do so. There is no allegation that Dr. Raiber was unaware that he had not removed the IUD or that he unintentionally permitted it to remain.

■ I conclude that the *res ipsa loquitur* allegations of Counts IX and X of the complaint do not satisfy 18 *Del.C.* § 6853. Nor does the pathologist's report add any facts which would bring the case within § 6853. Therefore, treating this motion as a motion for partial summary judgment, it will be granted in favor of Dr. Raiber as to Counts IX and X.

## II

Finally, Dr. Raiber challenges Count XI of the amended complaint insofar as the plaintiff's husband, Daniel C. Lacy, seeks damages because of his wife's inability to have children and for his witnessing the physical and emotional pain and suffering of his wife. Dr. Raiber contends that this claim exceeds the normal bounds of consortium and attempts to obtain damages for a by-stander who is not within the "zone of danger" and thereby violates the holdings of *Robb v. Pennsylvania Railroad Company*, Del.Supr., 210 A.2d 709 (1965); *Mancino v. Webb*, Del.Super., 274 A.2d 711 (1971); and *Cosgrove v. Beymer*, D.Del., 244 F.Supp. 824 (1965).

Defendant rests its contention on (1) the fact the husband was not within the "zone of danger", and (2) the fact that no Delaware precedent has been found which made reference to loss of child-bearing capability as being within the scope of loss of consortium.

The so-called "zone of danger" test was adopted by the Delaware Supreme Court in *Robb v. Pennsylvania Railroad Company*, Del.Supr., 210 A.2d 709 (1965) which involved a plaintiff who was standing near the automobile which she had been driving and which had become stalled on railroad tracks as a train approached and was struck by the train. Plaintiff was not touched, but contended that as a result of fright she suffered from an emotional disturbance which resulted in physical harm. The Supreme Court held that plaintiff's allegations set forth a valid claim. *Robb* did not involve the scope of a claim for loss of consortium and did not involve a husband-wife relationship.

The claim which defendant has moved to dismiss is founded upon special rights which derive from the marital relationship existing between the primary claimant, who was allegedly physically injured by defendant, and this plaintiff, who is her husband. Therefore, the focus is upon the claim for loss of consortium and the elements of allowable damages thereunder.

Historically, the marital status created, at least in the husband, certain rights with respect to the spouse and the law provided a remedy for the spouse against a third party who had interfered with such rights. *Prosser & Keeton on Torts* § 125, p. 931–2;

*Eliason v. Draper*, Del.Super., 77 A. 572 (1910). Initially that remedy applied where the interference was by alienation of affections. Ibid. However, by way of dictum *Eliason v. Draper*, supra, which was based on alienation of affections indicated that distinction would not be made between loss of consortium growing out of personal injury to a spouse and that growing out of alienation of affections. That dictum of *Eliason* appeared as the holding in *Townsend v. Wilmington City Ry. Co.*, Del.Super., 78 A. 635 (1907), which was based on injury of a wife in an automobile accident.[1] Whatever may have been the rationale and uncertainty of the past, the soundness of the right of action by either husband or wife for loss of consortium resulting from physical injury of the other spouse in Delaware has become undisputed in subsequent years. *Stenta v. Leblang*, Del.Supr., 185 A.2d 759 (1962); *Yonner v. Adams*, Del.Super., 167 A.2d 717 (1961); *Slovin v. Gauger*, Del.Super., 193 A.2d 452 (1963), *aff'd* 200 A.2d 565 (1964); *Folk v. York-Shipley, Inc.*, Del.Supr., 239 A.2d 236 (1968); *Biddle v. Griffin*, Del.Super., 277 A.2d 691 (1970).

 The cause of action for loss of consortium rests upon the elements, (1) that the party asserting that cause of action was married to the person who suffered physical injury at the time the injury occurred, (2) that the spouse suffered injury which deprived the other spouse of some benefit which formerly existed in the marriage, and (3) that the injured spouse has a valid cause of action for recovery against the tortfeasor. The spouse who asserts loss of consortium need not have any physical proximity to the site of the injury because the enveloping status which arises from that marriage status qualifies the spouse to assert the action. This status contrasts with even other family relationships, such as that of parent and child, where no comparable cause of action exists and each non-spouse family member must

meet the "zone of danger" test. *Broomall v. Reed*, Del.Supr., 445 A.2d 334 (1981).

The remaining issue is the scope of damages permissible under a loss of consortium claim.

 Defendant contends that the zone of danger concept places a limitation on the elements of damage which are recoverable under a claim for loss of consortium. For the reasons set forth above, I find no basis for applying zone of danger considerations in determining the elements of loss of consortium.

Delaware cases have not defined the precise damages which are permissible under a claim for loss of consortium. In *Townsend v. Wilmington City Ry. Co.*, supra, a husband was permitted to recover the expenses for treating his wife's injuries and for loss of his wife's services to the family. In *Eliason v. Draper*, supra, the Court spoke of a woman's right to her husband's society, comfort and assistance. In *Lupton v. Underwood*, Del.Super., 85 A. 965 (1912), a woman was compensated for the injury to her feelings, for loss of her husband's comfort and society, and for loss of support.

 Generally, damages for loss of consortium damages encompass loss of society, companionship, affection, and sexual relations. *Restatement (Second) of Torts* § 693 comment f (1977). However, damages are not limited to these claims and, in fact, involve many facets of the marital relationship. These include: aid, assistance, comfort, society, services, companionship, affection, fellowship, sexual relations, solace, conjugal life, all the assistance that accompanies the marriage relationship, love, physical and emotional support, contentment, satisfaction, and hopes and expectations relating to the marital existence. *Lithgow v. Hamilton*, Fla.Supr., 69 So.2d 776 (1954); *Rodgers v. Boynton*, Mass.

---

**1.** It is noted that in *Sobolewski v. German*, Del.Super., 127 A. 49 (1924) Judge Rodney, apparently without noting *Townsend v. Wilmington City Ry. Co.*, supra, citing decisions from Maryland, Kentucky and Oregon concluded that at common law a wife had no common law cause of action for loss of consortium occasioned by physical injury to the husband.

Supr., 315 Mass. 279, 52 N.E.2d 576 (1943); *Murray v. Murray*, N.M.Supr., 30 N.M. 557, 240 P. 303 (1925). Although Delaware Courts have not specifically decided the issue as to whether the right to have children is included as an element of consortium, this Court in holding that a wife could claim loss of consortium resulting from physical injury to her husband gave the following illustration:

> Take the case of a husband who suffers an incapacitating injury to his reproductive organs. In his personal injury suit it is clear that his damages are predicated upon *his* physical injury which precludes him from copulation, procreation, and an otherwise full enjoyment of his marital state. However, the wife's loss is just as real as it is distinct. She can no longer enjoy *her* legally sanctioned and morally proper privilege of copulation or procreation, and is otherwise deprived of *her* full enjoyment of her marital state.

*Yonner v. Adams*, Del.Super., 167 A.2d 717, 728 (1961) (emphasis in original).

Courts in other jurisdictions have specifically recognized that loss of consortium includes the privilege of procreation and the anguish of the "non-injured" spouse. In *Diaz v. Eli Lilly and Company*, Mass. Supr., 364 Mass. 153, 302 N.E.2d 555 (1973) the Court discussed the loss of prospects of motherhood if a husband is injured. In *General Electric Company v. Bush*, Nev. Supr., 98 Nev. 360, 498 P.2d 366 (1972), the basis for recovery by a wife for loss of consortium was her anguish from witnessing her husband's pain in addition to her inability to bear children by her husband. In *Clouston v. Remlinger Oldsmobile Cadillac*, Ohio Supr., 22 Ohio St.2d 65, 258 N.E.2d 230 (1970) the Court discussed the pain and anguish suffered by the spouse of an incapacitated person, particularly if denied the opportunity to have children. In *Thill v. Modern Erecting Company*, Minn. Supr., 284 Minn. 508, 170 N.W.2d 865 (1969) the Court stated that the predominant element in loss of consortium is the loss of a sexual relationship, including frustration of the primal drive of reproduction.

In *Millington v. Southeastern Elevator Co.*, N.Y.Ct.App., 22 N.Y.2d 498, 293 N.Y. S.2d 305, 239 N.E.2d 897 (1968) the Court discussed the deprivation of opportunity of rearing children and the mental and emotional anguish of the deprived spouse watching the deterioration of the impaired spouse.

■ For a couple planning to raise a family, an injury to the reproductive organs of one partner is an injury to both. The damage is not limited to the physical injury, nor is it limited to the person with the physical injury. The "non-injured" spouse bears no physical wounds, but suffers nonetheless. If the state of the marriage warrants a claim for loss of consortium, I conclude that the loss of the expectation of sharing parenthood with one's wife is a proper element encompassed within that claim.

■ Turning to the remaining element which defendant attacks, namely, the distress resulting from observing the suffering of the injured spouse, this is clearly a foreseeable detriment to the spouse and is a direct result of the alleged tort. This may be a product of the disturbance of the marital status as it existed before the spouse's injury and is merely another facet of the disruption of the harmonious coexistence which may have existed before the injury.

> Although disparagingly referred to as "sentimental" or "parasitc" [sic] damages, the mental and emotional anguish caused by seeing a healthy, loving companionable mate turn into a shell of a person is undeniably a real injury.

*Hopson v. St. Mary's Hospital*, Conn. Supr., 176 Conn. 485, 408 A.2d 260, 264 (1979). Mental anguish is an intangible, but it is no more difficult to measure than it is to put a value on loss of solace. Clearly, concern over one's spouse is inherent in the marital relationship, and is just as properly a claim in a loss of consortium action as are the more traditional elements.

I conclude that Count XI of the amended complaint does not seek elements of damages for loss of consortium which are not properly within that concept.

### III

Based on the foregoing considerations, the motion of defendants Richard Raiber, M.D. and Richard Raiber, M.D., P.A. to dismiss Counts IX and X of the amended complaint is granted and the motion to dismiss Count XI of the amended complaint is denied.

IT IS SO ORDERED.